UNITED STATES, Appellee

v.

JAMES B. WOOTEN, Private First Class, U. S. Army, Appellant

1 USCMA 358, 3 CMR 92

No. 369

Decided May 2. 1952

LT. COL. George M. Thorpe, U. S. Army, and 1ST LT. Michael E. McGarvey, U. S. Army, for Appellant.

LT. COL. Paul J. Leahy, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before us on petition for review granted January 28, 1952, pursuant to the provisions of the Uniform Code of Military Justice, Article 67(b)(3), 50 USC § 654. The petitioner, Wooten, was tried jointly with two other soldiers by general court-martial at Yokohama, Japan, on July 16, 1951, for the larceny and wrongful disposition of Government property in violation of Article of War 94, 10 USC § 1566. The first of two specifications alleged in substance that petitioner and Corporal Ralph E. Darling, acting jointly and in pursuance of a common intent, in conjunction with Corporal Kenneth E. Grueschow, stole 250 pairs of woolen trousers, of a value of about $2,600.00, property of the United States, furnished for the military service thereof, at or near Tokyo, Japan, on or about May 14, 1951. The second specification alleged that petitioner and Corporal Ralph E. Darling, acting jointly and in pursuance of a common intent, in conjunction with Corporal Kenneth E. Grueschow, wrongfully and knowingly sold the same quantity of trousers at or in the same vicinity, on

or about the same date.. The three accused pleaded not guilty to all specifications and charges. They were found guilty as charged, and each was sentenced to be dishonorably discharged, to forfeit all pay and allowances, and to be confined at hard labor for 1 year. The convening authority approved, and a board of review in the office of The Judge Advocate General, United States Army, affirmed the findings and sentences. The order granting the accused, Wooten's, petition limited briefs and argument to the issue of sufficiency of the evidence as a matter of law to sustain findings of guilty.

II

The Government's evidence consisted principally of the testimony of several Japanese nationals and the pre-trial written confessions made by each of the accused to agents of the Criminal Investigation Division. It appears that on or about May 14, 1951, the accused, Wooten, entered the mess hall of the Tokyo Quartermaster Depot, saw Corporal Grueschow sitting alone, and joined him. In the course of an ensuing conversation, Grueschow informed

Wooten that "he would like to have some ODs." Corporal Darling, a Quartermaster warehouse supervisor sitting nearby, had told Wooten on a previous occasion that he "would like to get rid of some stuff." Wooten immediately told Darling that Grueschow would like to secure a quantity of issue trousers. He saw Grueschow again that night, learned from him that the latter had obtained five bales of trousers, and informed him that he, Wooten, wanted "one hundred thousand [yen]." Gruechow assented. The substance of this account was contained in the pre-trial statement of the accused, Wooten. The testimony of several Japanese nationals established the journey of the stolen trousers from the Tokyo Quartermaster Depot. Rokuro Nabata testified that he was a truck driver employed by the Motor Group, Camp Yokohama, and that on or about May 14, 1951, he drove his truck to the Tokyo Quartermaster Depot for the purpose of picking up rolled paper and other packaged items from the warehouses. He was accompanied on this trip by a soldier whom he identified as Corporal Grueschow. He stated that Japanese laborers loaded several burlap bags into his truck; that these bags were about 3 feet in length and 1½ feet in width; and that they closely · resembled the bags recovered by Criminal Investigation personnel and · shown in Prosecution Exhibit 2, a photograph of the stolen trousers. After the truck was loaded, Grueschow rode with Nabata to an Army warehouse at Idogaya, Japan, where the truck was unloaded. Hiroyasu Kawamura, another Japanese national, testified that he was employed by the United States Army as a jeep driver, and that on May 19, 1951, he transported five or six bundles of trousers from the Idogaya warehouse to Hodogaya on Grueschow's orders. He delivered the trousers to a named Japanese hotel and returned to the motor pool. This witness stated that Prosecution Exhibit 2, a photograph of the stolen trousers, was a good representation of the bundles he transported. Matsutaro Imai testified that he knew one Kazuko Ohya, and her American husband, Grueschow, and that about

May 14, 1951, the latter brought five bundles which contained trousers of the type worn by American soldiers during the winter, to the Takashima Hotel. Two hours later a laundryman named Yoshida picked up two of the bundles, and shortly thereafter agents of the Criminal · Investigation Division entered the hotel and took possession of the three remaining bundles. Masu Numajiri testified that on or about May 19, 1951, he went to the Takashima Hotel with Kazuko, Grueschow's wife, where he purchased 100 pairs of Army trousers for which he paid 210,000 yen to Kazuko, who surrendered the money to her husband. Masuo Yoshida testified that at the request of Masu Numajiri he transported 100 pairs of Army winter woolen trousers from the Takashima Hotel to the residences of two Japanese nationals. He delivered 30 pairs of trousers to the house of Shinsaku Miyata and 70 pairs to the house of Zen Hirao. Miyata and Hirao both admitted receiving the trousers and stated that a short time thereafter agents of the Criminal Investigation Division recaptured and removed them.

Raymond Walter Beckwith, an agent of the 44th Criminal Investigation Detachment, testified that pursuant to a telephone call received by his office, he proceeded to the Takashima Hotel where he found and recovered three bales of Army trousers. He also discovered the accused, Grueschow, in a hotel room there, and under a pillow near him he found 210,000 yen. With the assistance of Grueschow and the latter's wife, Beckwith then recovered the two lots of 70 and 30 pairs of trousers from the two Japanese homes to which they had been delivered. Thus all of the stolen trousers were recovered. Agent Beckwith identified two pairs of trousers displayed by the trial counsel as being two of the pairs he had recovered. These were admitted in evidence without objection from the defense. This agent also testified that the photograph earlier displayed by the prosecution was an accurate representation of the trousers which had been seized.

It was stipulated between the prosecution and the defense, with the con-

sent of each of the accused, that the value of 250 pairs of trousers of the type in question was in excess of $50.00.

With regard to the written and signed confessions of each of the accused, the record indicates that these were entirely voluntary statements, made after each accused had been duly warned of his rights under Article of War 24, 10 USC § 1495, and that they were not made as a result of threats, promises, or inducements of any sort. The court was properly instructed to consider each confession as evidence against only the accused who signed it, and warned against considering each as to any one of the other accused persons. The substance of Wooten's confession has been outlined earlier herein, and Agent Beckwith testified that Wooten "did admit being involved in the transaction in question." The statements of Grueschow and Darling constitute full and complete confessions of their direct participation in the theft and disposition of the property as set out above. Although there was a degree of contradiction and confusion in the testimony of the Japanese nationals who testified at the trial, this may be attributed to translation difficulties, to their reluctance as witnesses, or to genuinely defective memories. In any event, the facts as they have been recounted are clearly established by the testimony of record and the confessions of the three accused.

It is noted that Corporal Darling's statement revealed that Wooten had estimated that the trousers would yield about 500,000 yen and had demanded that he, Wooten, receive 100,000 yen. Darling supposed that Grueschow and he would receive about 200,000 yen each from the transaction. These figures are confirmed in Grueschow's statement. Grueschow also admitted that he had told his wife that he had five bags of trousers which a soldier had passed to him for disposal, and that his wife had said that she could readily find a buyer. In addition, according to Grueschow's statement, it was Wooten himself who had asked the former if he could "get rid of five bags of pants." Grueschow agreed to do so. Wooten thereafter introduced him to Darling, who was to supply the trousers. The record of trial, with accompanying papers, discloses that the common trial of these accused was both appropriate and desirable in view of the identity of issues and necessary witnesses. It is obvious, of course, that in determining whether there was sufficient evidence to sustain Wooten's conviction, we are not permitted—nor was the court-martial during his trial —to consider the confessions of the other two accused. Petitioner's guilt, if any, must be predicated on the theory that he aided, abetted, or counselled the other two soldiers in the commission of the theft and subsequent wrongful sale, or procured or induced these actions, and that he is, therefore, criminally responsible as a principal. Accordingly, the only question presented in this case is whether there is sufficient evidence in the record to sustain the finding that Wooten aided, abetted, or counselled Grueschow and Darling, or that he procured or induced the perpetration of their offenses.

### III

Inasmuch as these offenses were committed prior to May 31, 1951, the accused was charged with violations of the Articles of War, and the determination of his innocence or guilt must be governed by the provisions of those Articles and the Manual for Courts-Martial, U. S. Army, 1949. Paragraph 27 of the 1949 Manual provides in pertinent part that:

"Anyone who commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is a principal; and anyone who causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such."

The above language of the Manual for Courts-Martial, supra, is substantially identical to the provisions of Title 18, United States Code, § 2:

361

"§ 2. Principals

"(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.

"(b) Whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such. (June 25, 1948, ch 645, § 1, 62 Stat 684, eff Sept. 1, 1948.)"[1]

In view of the similarity between the provisions of Title 18, § 2, and those of paragraph 27 of the Manual, Federal cases interpreting and applying the former are pertinent to the determination of the issue before us. The Supreme Court of the United States declared in Nye & Nissen v. United States, 336 US 613, 618–619, 93 L ed 919, 925, 69 S Ct 766, that:

"The trial court charged that one 'who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly.' That theory is well engrained in the law. See § 332 of the Criminal Code, 18 USC § 550, now § 2; United States v. Johnson, 319 US 503, 518, 87 L ed 1546, 1558, 63 S Ct 1233; United States v. Dotterweich, 320 US 277, 281, 88 L ed 48, 52, 64 S Ct 134. In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' L. Hand, J., in United States v. Peoni, 100 F2d 401, 402."

This rule defining aiders and abettors, originally enunciated in United States v. Peoni, 100 F2d 401, (CA2d Cir), and followed by the Supreme Court in Nye & Nissen v. United States, supra, has also been recognized and applied by us in United States v. Jacobs (No. 152) 1 USCMA 209, 2 CMR 115, decided March 13, 1952. The following excerpt from 22 Corpus Juris Secundum § 92 effectively summarizes several well-known principles governing accessories:

"To render one guilty as an accessary [sic] before the fact, he must have had the requisite criminal intent; and it has been said that he must have the same intent as the principal. It is well settled, however, that he need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him."

And in the discussion of the requirement of community of unlawful purpose on the part of aiders and abettors, it is stated in 22 Corpus Juris Secundum § 87a that:

"In order to show a community of unlawful purpose it is not necessary to show an express agreement or an understanding between the parties; nor is it necessary that the conspiracy or common purpose shall be shown by positive evidence; its existence may be inferred from all the circumstances accompanying the do-

[1] It is to be observed that the Reviser's Note to the above section states in pertinent part that: "The section [§ 2] as revised makes clear the legislative intent to punish as a principal not only one who directly commits an offense and one who 'aids, abets, counsels, commands, induces or procures' another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States.

"It removes all doubt that one who puts in motion or assists in the illegal enterprise but causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." But cf. United States v. Paglia, 190 F2d 445 (CA2d Cir), which holds that 18 USCA § 2, does not enlarge criminal responsibility.

ing of the act, and from conduct of defendant subsequent to the criminal act; in other words, preconcert or a community of purpose may be shown by circumstances as well as by direct evidence."

Although the distinctions of guilt between principals, aiders and abettors, and accessories have been abolished by Federal statute, and all are chargeable and punishable as principals, it has been held that it is nevertheless necessary to apply common law rules in determining whether a person, who was absent when the crime was committed by others, is guilty as a principal under the statute. United States v. Pritchard, 55 F Supp 201, affd in Waters v. United States, 145 F2d 240 (CA4th Cir). That is to say, to be guilty under the statute as a principal, such a person must have been properly characterizable as an accessory before the fact at common law. In the Pritchard case the court used the following language in defining an accessory before the fact (p 203):

"At common law an accessory before the fact to a felony . . . is one, who though absent at the commission of the felony, counsels, incites, induces, procures, encourages, engages or commands another to commit the felony subsequently perpetrated. It is not necessary that he shall be the originator of the design to commit the crime; it is sufficient if, with knowledge that another intends to commit a crime, he encourages and incites him to carry out his design; nor is it essential that any specific mode for perpetrating the crime shall be counseled, encouraged or commanded. The communication between the accessory and the principal may be through a third person, and it is not necessary either that the accessory shall know by whom the crime is actually to be committed, or that the identity of the accessory be known to the principal in the crime. 22 CJS, Criminal Law, § 93, pp 164, 165. . . . Responsibility for crime is not limited under the federal statute to those who do the overt acts. It extends to all who knowingly and willfully take a hand in it, within the act defining a principal."

With regard to the matter of counseling the commission of an offense, the following language is quoted from Wharton's Criminal Law, Vol 1, § 266:

"Counseling is said in an old book to be either direct or indirect; direct consisting in express counsels, indirect in the intimation of approval or desire. But concealment of the knowledge that a felony is about to be committed does not constitute such accessoryship, nor does mere momentary acquiescence in the proposed felonious plan. *But any specific contribution of advice, afterwards* acted on, constitutes the offense." [Italics supplied]

And with respect to the manner of aiding or encouraging the commission of an offense, the following passage is quoted from American Jurisprudence, Criminal Law, Vol 14, § 101:

"The advice or encouragement which will render one an accessory before the fact may be by acts or words, but it must, to create guilt, be used with the intent to encourage and abet the crime. *The amount of advice or encouragement rendered is not material if it has effect* in inducing the commission of the crime." [Italics supplied]

It would seem that the guilt of petitioner in this case must be predicated upon a theory of accessoryship, and not one of aiding and abetting, in view of the fact that he was not present at the time of the commission of the offenses in question. This is certainly true in the strict sense of the common law definitions. However, we do not believe this to be a matter of moment in the present setting. It is observed that since the enactment of statutes making accessories, and aiders and abettors, punishable as principals, many courts have indiscriminately referred to accessories as aiders and abettors. See Morei v. United States, 127 F2d 827, 831, (CA 6th Cir). Our inquiry here is merely whether there is suffi-

**363**

cient evidence in the record to show that the words and conduct of the accused brought him within the definition of an accessory before the fact at common law, and thus as a principal within the provisions of paragraph 27, Manual for Courts-Martial, U. S. Army, 1949. The following passage from Ladrey v. United States, 81 App DC 127, 130–131, 155 F2d 417, 420, cert den 329 US 723, 91 L ed 627, 67 S Ct 68, is illustrative of the general type of approach approved by us in this case:

"Our Code [Title 22, § 105, District of Columbia Code (1940)] obliterates the former distinction between principals and accessories before the facts. In the case of Maxey v. United States, this court dealt with a factual situation not unlike that present here. In that case the accessory was not personally present inciting the principal to or aiding in the performance of the criminal act. All that was necessary, we said in that case, was to prove facts and circumstances from which it might be inferred, with sufficient certainty, that the accessory abetted the performance of the criminal act in such a way as to constitute him a principal offender under the section of the Code just cited. One who procures, commands, advises, instigates or incites the commission of an offense, though not personally present at its commission, is, by the common law, an accessory before the fact. The Code provision makes all such persons principals."

## IV

We come now to an application of the foregoing principles to the facts of the instant case. Clearly, if the accused, Wooten, had knowingly and unlawfully assisted the other two offenders by helping them physically to load the bales of trousers on the truck, we suppose no one would deny that he was patently an aider and abettor—and therefore a principal and punishable as such. We see little difference, in essence, as well as in net result under applicable law, between conduct amounting to the performance of such an act, on the one hand, and, on the

**364**

other, words and conduct encouragingly bringing together two individuals known to be bent on mischief with a view to promoting or instigating the commission of a crime. Moreover, the accused's demand for 100,000 yen, presumably a share in the fruits of the offense, tends strongly to show that he had sufficiently associated himself with the venture and that a community of purpose existed.

In Cantrell v. State, 29 Ala App 614, 199 So 742, 743, the court stated:

"The issue of guilt was plainly for determination of the jury. One who, though not present, aids or abets in the commission of a felony is guilty and punishable as a principal. Alexander v. State, 20 Ala App 432, 102 So 597; McMahan v. State, 168 Ala 70, 53 So 89; Code 1923, Sec 3196. The words aid and abet comprehend all assistance rendered by acts or words of encouragement, or support or presence, to render assistance should it become necessary, and no particular acts are essential. Raiford's case, Raiford v. State, 59 Ala 106."

From the facts and circumstances reflected in the case against the petitioner here, the triers of fact could have inferred reasonably that he had incited or promoted the performance of the criminal acts of his partners, and that he had such a stake in their outcome as to constitute him a principal offender under the pertinent provisions of the 1949 Manual. We cannot say that these inferences were improper, loose, or arbitrary in the light of the evidential picture as it involves the accused. It would seem that the counseling or promoting need not be fully articulated if the accused's words and conduct were accompanied by intent and were effective. In other words, the means employed to aid in, or to procure or instigate the commission of an offense are immaterial, if there is in fact some action or conduct which aids, procures, or instigates. See excerpt from Cantrell v. State, supra. It has been stated that, "to 'instigate' means to aid, promote, or encourage the commission of an offense," and that "one

'of its synonyms is 'abet'." Nye & Nissen v. United States, 168 F2d 846, 854 (CA 9th Cir), affd 336 US 613, 93 L ed 919, 69 S Ct 766. It is most improbable that petitioner did not realize that the other soldiers were predisposed to engage in unlawful conduct. His conversation in the mess hall with Grueschow, in the course of which the latter expressed his desire to obtain trousers, and his knowledge that on a previous occasion Darling had declared that he "would like to get rid of some stuff," suggests that he was fully aware of the type of transaction he was instigating. His conduct in subsequently demanding a share of the proceeds supplies the final touch.

What has gone before applies with equal force to the offense of unlawful sale. Under the circumstances of the case it seems certain that petitioner must have contemplated specifically that there would be a sale of the stolen goods as a means of realizing a profit from the venture—and, accordingly, the sale was an essential part of the unlawful scheme. However, even were it to be conceded that the sale was not subjectively contemplated, it was nevertheless such a natural and probable consequence of the theft as to be chargeable against the accused. It is difficult to see what possible use a member of the armed forces in Japan could make of 250 pairs of Army issue trousers other than that suggested by the Government. As was argued forcefully by appellate Government counsel, the theft of such a large number of items raises an inference of great compulsion that the thief will seek to realize through sale a profit from the fruits of the crime. It is hardly conceivable that a thief who is in possession of 250 pairs of recently stolen trousers would keep them for his own wear. The Manual for Courts-Martial, United States, 1951, paragraph 156, recognizes and restates a well-settled rule of criminal responsibility, viz.:

"To constitute one an aider and abettor under this article, and hence liable as a principal, mere presence at the scene is not enough; there must be an intent to aid or encourage the persons who commit the crime. The aider and abettor must share the criminal intent or purpose of the perpetrator. If there is a concert of purpose to do a given criminal act, and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned; but in order to make one liable as a principal in such a case, the offense committed must be one embraced by the common venture or an offense likely to result as a natural or probable consequence of the offense directly intended.

. . . . . . .

"One who counsels, commands, or procures another to commit an offense subsequently perpetrated in consequence of such counsel, command, or procuring is a principal whether he is present or absent at the commission of the offense. . . . When the act is done, such principals are also chargeable with all results that could have been expected to flow as a probable consequence from the act counseled, commanded, procured, or caused to be done."

The record contains substantial evidence to warrant a reasonable inference that the unlawful sale was a natural and probable result of the theft.

### V

It remains only to comment briefly on two cases relied upon by appellate defense counsel in challenging the sufficiency of the evidence. The first of these is United States v. Peoni, supra. There a defendant had sold counterfeit bills to a second party, who sold the same bills to a third, all knowing the bills to be counterfeit. The court held that the defendant was not an accessory to the third person's possession, since the defendant's connection with the business ended when he received his money from the second party, who might dispose of the bills as he chose. The court stated that (p 402–403):

". . . Peoni was not an accessory to Dorsey's possession; his connection with the business ended when he got his money from Regno, who

**365**

might dispose of the bills as he chose; it was of no moment to him whether Regno passed them himself, and so ended the possibility of further guilty possession, or whether he sold them to a second possible passer. . . . The real gravamen of the charge against him is his utterance of the bills; and he ought not to be tried for that wherever the prosecution may pick up any guilty possessor—perhaps thousands of miles away."

The first basis for distinction between the Peoni case and the present one is that there the defendant's participation consisted only of his sale of the bills and his receipt of payment therefor. Thus his interest in the venture had come to an end prior to the disposition of the bills by Regno. However, the accused in the case at bar had not yet received his share of the spoils, and his interest in the matter can in no sense be said to have terminated. Secondly, as suggested earlier, it is reasonable to infer that the accused knew that it would be necessary to sell the trousers in order to realize a profit in which he would share. Hence his interest in the business could not have terminated until the goods had been sold, and the money to furnish his portion of the fruits had been acquired. It has also been urged upon us that in the Peoni case the court rejected for criminal cases the proximate cause theory. While it is possible that support for this view is present there, our study of the decision convinces us that the court was speaking only with reference to the particular facts of that case. It is certainly a well-established rule of criminal responsibility that principals are chargeable with results which flow as natural and probable consequences of the offense subjectively intended.

A further case on which the defense appears to rely is Morei v. United States, supra. In that case a Government informer, one Beach, was sent to buy narcotics from a Dr. Platt, one of the defendants. The doctor gave Beach the name of defendant Morei in Cleveland as a man who could supply what he wanted. After conferring with Beach, Morei procured the drug. Both Morei and Platt were charged as principals in a narcotics violation. In reversing the convictions, the court stated (p 831):

"If the criterion for holding that one is guilty of procuring the commission of an offense, is that the offense would not have been committed except for such a person's conduct or revelation of information, it would open a vast field of offenses that have never been comprehended within the common law by aiding, abetting, inducing or procuring. . . .

"Of the charge that he was guilty of purchasing and selling narcotics, based on the theory that he had aided and abetted, or was an accessory before the fact, in the commission of these acts, there was no evidence to convict Dr. Platt. . . . There was no evidence that Dr. Platt planned with the other defendants or conspired directly or indirectly with them, or had any understanding with Morei to buy or sell narcotics. There was no community of scheme between him and the other defendants. They share no common intent or plan, nor was there any prearrangement or concert of action."

Portions of the foregoing language have been cited by appellate defense counsel, who contends that on the basis of the Morei case, and in light of petitioner's statement, there is nothing whatever to establish that accused planned or urged the commission of the larceny. He further suggests that there is no showing of preconcert or joint plan, and that no criminal responsibility attaches for the subsequent sale of the property. On this latter point particularly, it is urged that the case is controlling. Although at first blush it might appear that the Morei case is in point, further analysis dispels any such notion. First of all, as has been said, a common plan or purpose could reasonably have been inferred from all the circumstances in the instant case interpreted in terms of the background against which they transpired. Second, and more important, the defendant physician in the

Morei case, unlike the petitioner here, had no expectation of remuneration. The court there said (p 831–832):

> "Dr. Platt was paid nothing and it is not claimed that he asked for any remuneration or expected to receive anything from the claimed transaction. . . . the only thing Dr. Platt did was to give Beach the name of Morei as a man from whom he might secure heroin to dose horses in order to stimulate them in racing. This is not the purposive association with the venture that, under the evidence in this case, brings Dr. Platt within the compass of the crime of selling or purchasing narcotics, either as principal, aider and abettor, or accessory before the fact."

The accused, Wooten's demand for 100,000 yen from Grueschow, which under the circumstances may reasonably be interpreted as a share of the proceeds of a subsequent sale, was highly incriminatory and disclosed a "purposive association with the venture." Under the evidence in the present case, this brings him within the area of responsibility as a principal in the offenses charged. We are of opinion, therefore, that there is sufficient evidence in the record before us to sustain the findings of guilty of the offenses charged against petitioner.

VI

Although no point is made of the matter by counsel, it is noted that whereas the accused was charged inter alia with the sale of 250 pairs of trousers and found guilty under the specification involved, the evidence reflects a sale of 100 pairs only. However, in view of the stipulated value of Army issue woolen olive-drab trousers, this variance need not concern us. Moreover, in view of the relatively modest sentence imposed by the court-martial, no action is deemed necessary. See ACM 1458, United States v. Worley, 3 CMR(AF) 424; ACM 2520, United States v. Steinmetz, 2 CMR(AF) 850; United States v. Kallish, 32 BR 137; United States v. Schallenberg, 28 BR 379.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.