UNITED STATES, Appellee

v

ARTHUR R. DESROE, Private First Class, and DAVID H.
POUNCEY, Private E-2, U. S. Army, Appellants

6 USCMA 681, 21 CMR 3

682

683

No. 6931

Decided February 24, 1956

*Captain Albert C. Malone, Jr.,* argued the cause for Appellants, Accused. With him on the brief was *Lieutenant Colonel Jackson K. Judy.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Both accused were convicted by general court-martial of unpremeditated murder and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for twenty-five years. The convening authority approved the findings and sentence as to each accused, and a board of review has affirmed. We granted review, limiting briefs and arguments to the following three issues:

(1) Whether the law officer erred in excluding the details of alleged

acts of violence by the deceased immediately preceding the homicide;

(2) Whether the law officer's instructions on aiders and abettors were adequate in view of the pretrial statement of the accused, Pouncey;

(3) Whether the law officer erred in denying the requested defense instruction to the effect that heat of sudden passion could be engendered by fear.

This tragic drama was enacted in an aura of confusion and uncertainty when the minds of the actors were apparently dulled by the excessive use of alcoholic beverages. Out of the maze of conflicting statements, we shall erect an evidential structure as complete and accurate as possible. However, the issue which requires a reversal is of such a nature that only the facts governing it need be stated precisely.

On August 30, 1954, the accused, Desroe and Pouncey, together with the deceased, a man named Gibby, attended a "party" given for members of Battery C of the 9th Antiaircraft Artillery Battalion. Approximately 60 members of the organization attended, and the group consumed some 35 cases of beer. As time progressed, many of the personnel present engaged in violent arguments which culminated in numerous fisticuffs. Literally speaking, the party ended in a series of drunken brawls, and knives were used unsparingly. The deceased became unusually belligerent, denounced in gutter language several of the noncommissioned officers present, and argued vehemently with the acting first sergeant concerning the latter's action in ordering the bar closed. Soon thereafter, one Birdwell and the accused, Desroe, were observed outside the club discussing the former's participation in a previous fist fight. Gibby approached the pair, questioned Desroe's interference in yet another affray, heated words were exchanged, and a fight ensued. Desroe and the deceased were described as swinging "toe-to-toe," but no knockdowns were scored by either antagonist. Several bystanders, including the accused, Pouncey, were in the immediate area watching the struggle, but no one was seen to intervene. After the battle had continued for a short time, Desroe dropped back on one knee, arose, and walked away; the deceased stood upright for a moment, then toppled face down to the ground. He died immediately. A knife covered with stains which matched the deceased's blood type was later discovered near the scene, and a medical expert determined that death resulted from multiple wounds inflicted by a penetrating instrument.

Pretrial statements describing the fight were taken from both accused and admitted into evidence at the trial. In his account of the incident, Desroe stated that Gibby accosted him with a bottle in hand, knocking him down with a blow to the jaw. However, he was uncertain whether Gibby used the bottle as a bludgeon, or merely used his fist. As the accused, Desroe, attempted to regain his feet—he said—Pouncey, or one Thurmond, passed an open knife into his hand with the warning: "You have to watch GIBBY, because he has a knife." Thus armed, Desroe recalled that he began swinging with the knife and inflicted wounds on the deceased's back. Of significant importance in this first statement is the total absence of any claim of fear of, or choking by, the victim.

Pouncey's statement corroborates that of Desroe in some respects, but differs in regard to one important fact. Although admitting that he handed Desroe an open knife during the fight, Pouncey insisted that he did so because of Desroe's request for it, and the latter's statement that he intended to use it in a fight with one Padgett. When pressed by investigators to explain his action in thrusting a deadly weapon into the hand of a man locked in combat with another, Pouncey was unable to advance any reason for the move.

After the prosecution concluded its case, only the accused, Desroe, chose to take the stand on the merits. He testified in substance that Gibby knocked him to the ground with the first blow, and thereafter attempted to choke him. Just at that moment, the accused, Pouncey, slid the knife into his hand, saying: "You'd better watch him; he has

**685**

a knife. He will probably do you in." Fearing that Gibby—who was shown to be a stronger, larger man—would choke him to death, he stabbed the deceased repeatedly with the knife, not because of a desire to kill him, but in an effort to relieve the pressure of the victim's fingers on his neck.

During the course of trial, defense counsel on several occasions attempted to elicit from witnesses the details of certain specific acts of misconduct on the part of the deceased immediately prior to the fatal encounter. Objections to this line of questioning were interposed by trial counsel and sustained by the law officer. Thereafter, before the court-martial members were instructed on the law of the case, defense counsel requested that the law officer give an instruction embodying the concept that "heat of passion" can be engendered by fear as well as by rage. The request was denied by the law officer, and the court-martial remained uninformed as to that subject. Subsequently, the court-martial was instructed as to the elements of the offense charged, the law of self-defense, the ingredients of the lesser included offense of voluntary manslaughter, and the theory of principals. Defense counsel objected to the instructions concerning manslaughter and self-defense, and to the law officer's refusal to give the requested charge.

## II

Appellate defense counsel directs his initial attack against the law officer's refusal to admit into evidence testimony concerning the specific details of certain acts of violence committed by the deceased at the battery party. He contends such evidence is admissible when the quarrelsome character of the deceased is relevant in a homicide prosecution. Thus, because the accused claimed that the homicide was committed in self-defense, it is urged that the law officer should not have thwarted defense counsel's attempt to portray Gibby as the aggressor by showing his assaults upon other individuals during the earlier part of the evening.

To answer adequately the contention presented by the defense, it is necessary that we consider the rules and policies underlying the admissibility of evidence of the character of a homicide victim. It is generally recognized that where an issue of self-defense arises during the course of a trial for homicide, evidence of the violent or contentious character of the deceased may be relevant to show (1) the reasonableness of the defendant's apprehension of violence, or (2) the probability that the deceased was the aggressor. See Wigmore, Evidence, 3d ed, §§ 63, 246.

The first category does not apply to this case, however, because the purpose served in such a case is to show only the reasonableness of the defendant's apprehensive mental state. In that situation, proof of a turbulent character necessarily must be accompanied by proof of knowledge on the part of the accused of that character. Therefore, before such evidence is relevant, it is necessary that proof of the character of a deceased be tied in with evidence that his bellicose characteristics were communicated to the defendant. If the latter had no knowledge of the deceased's violent disposition, it is obvious that such evidence could have had no effect on his state of mind. Because this record is barren of any evidence to establish that the accused, Desroe, knew of Gibby's prior acts of violence, evidence of the victim's aggressive nature is not admissible on the first possible ground. Wigmore, supra, § 246.

With regard to the second ground of admissibility, however, the element of knowledge on the part of Desroe of the deceased's violent character is not a necessary predicate to the admission of such evidence. In this situation, there is no concern as to what an accused thought the deceased was going to do. Rather, the question of who probably was the aggressor, as between Gibby and Desroe, is illuminated by what the deceased would be likely to do. Therefore, proof of communication of Gibby's belligerent disposition to the defendant, Desroe, is not required to render the testimony admissible. Wigmore, supra, § 63.

In the case at hand, appellate defense counsel first urge that particular acts of violence on the part of █ the deceased were admissible as evidence of his belligerent nature, to establish whether Gibby or Desroe was the aggressor. Although the civilian authorities are divided with respect to the admissibility of such specific acts of conduct, we think that the better rule is in favor of permitting such evidence to be introduced by the accused. Wigmore, supra, § 198. Certainly, one with a turbulent disposition is more apt to instigate a fight than is one who is calm and dispassionate. To the extent that actions speak louder than words, specific prior acts of violence would be stronger evidence of disposition than reputation. Accordingly, instances of the deceased's prior fights, quarrels, and the like, which are related in time, place, or circumstances to the facts of the case under consideration, have often been admitted into evidence where there is a close question of self-defense. State v Waldron, 71 W Va 1, 75 SE 558 (1912); State v Ardoin, 28 NM 641, 216 Pac 1048 (1923). Concern over the possibility of the issue being abused need not detain us, as the number of such instances can be controlled by the discretion of the law officer. Thus, we hold the accused was entitled to show, by introducing evidence of Gibby's prior acts of violence, that the latter was aggressive by nature and, therefore, was probably the aggressor during the fatal encounter.

The difficulty we find with the accused's claim at this level is that he established the aggressive █ character of the deceased. At least two specific acts of violence were brought to the court-martial's attention by the defense counsel at trial. However, not satisfied with this much success, the accused now asks us to hold that the law officer abused his discretion in not permitting further details of these violent acts to be developed.

In Boston v State, 153 Fla 698, 15 So 2d 607 (1943), the Supreme Court of Florida dealt with a similar contention and sustained the ruling of the trial court which rejected details of prior violent acts. That court observed:

"The trial court permitted the appellant to testify as to the deceased's quarrelsome, violent and dangerous proclivities as reflected by an altercation with Oates, the barber, some two or three days prior to the shooting, and that the deceased had had trouble shortly prior to the shooting with a man by the name of Botto. The trial court simply held that counsel could not detail the merits of the several altercations of the deceased outlined in the proffer but the ruling did not preclude counsel from showing, if desired, that the deceased had had trouble with others, viz., Daves and Chester Darrell shortly prior to the shooting and that the appellant had knowledge of these facts when trouble arose between him and the deceased. The deceased had been in the community about two months prior to the shooting. The appellant testified before the jury as to the difficulties of the deceased with Oates and Botto. The trial court's ruling on the proffer of appellant did not preclude counsel from showing that the deceased had trouble with Darrell and others. It was the detailed merits or demerits of these several altercations of the deceased known to the appellant that the trial court denied."

Certainly, this accused is entitled to no greater consideration than he received. He was permitted to bring to the court-martial's attention two specific instances of the aggressive character of the deceased, and he was apparently given an opportunity to introduce other acts if he so desired. Once the deceased had been branded as the likely aggressor by such evidence, no important characteristic remained concealed. Indeed, had the law officer permitted the accused to bring out further details, he may have confused the issues, as the admission of the details of each previous act of violence might shift the attention of the fact finders from the trial of the accused to a trial of the deceased. Character evidence loses its value unless there is a fair possibility of doubt on the point, for

"otherwise the deceased's bad character is likely to be put forward to serve improperly as a mere excuse for the killing, under the pretext of evidencing his aggression." Wigmore, supra, § 63. Because the accused was permitted to establish firmly that the deceased was the aggressor, we certainly cannot say that the law officer erred in refusing to admit all the minute details of each altercation.

Even if we assume, arguendo, that the law officer erred, the ruling could not have prejudiced the accused. Defense counsel at trial was permitted to establish the deceased as the aggressor, to show that the deceased was a larger man than the accused, Desroe, and to bring out every facet of his theory of self-defense. Any further evidence as to the aggressive nature of the deceased would have been merely cumulative. Thus, the law officer's refusal to admit more details of aggression did not deprive the accused of evidence which, if admitted, might have led to a substantially different result.

### III

The second defense claim of error concerns the following instruction given by the law officer with respect to the theory of aiders and abettors:

"You are advised that any person who commits an offense is a principal. Likewise, any person who aids or abets the commission of an offense is also a principal and equally guilty of the offense. To constitute one an aider or abetter, and hence liable as a principal, he must share the criminal intent or purpose of the active perpetrator of the crime and must by his presence aid, encourage, or excite the active perpetrator to commit it. Mere presence at the scene of the crime is not enough. The proof must show that the aider or abetter did in some way associate himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it successful. If there is a concert of purpose to do a given act, and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned; but in order to make one liable as a principal in such a case, the offense committed must be embraced by the common venture and probable consequence of the offense directly intended."

It is claimed that this instruction is erroneous because it contains no statement to the effect that an aider and abettor can be found guilty of any offense lesser in degree than that of which the principal is convicted. Further, appellate defense counsel insist that involuntary manslaughter was reasonably raised as to the accused, Pouncey, and that, because of the instructional deficiency, the members of the court were never informed that they might consider this lesser offense in determining Pouncey's guilt or innocence.

We find no merit in this contention for two reasons. First, if the instructions were not clear, there was no request for clarification. Second, the issue of involuntary manslaughter was not raised. We shall discuss the reasons in the order stated. The quoted instruction correctly sets out the rules formulated by this Court relating to the theory of aiders and abettors. The court-martial was told that Pouncey must have shared the criminal intent of the active perpetrator of the crime and must by his presence have aided or encouraged the active perpetrator to commit it. United States v Jacobs, 1 USCMA 209, 2 CMR 115. Moreover, the instruction further advised the court members that all probable results which could be expected to flow from the act are chargeable to all parties concerned, and that in order to make one liable as a principal, the offense committed must be one embraced by the common venture and a probable consequence of the offense directly intended. United States v Wooten, 1 USCMA 358, 3 CMR 92. When this instruction is read as a whole, it is beyond doubt that the triers of fact were informed fully as to the standards to employ in weighing the evidence against Pouncey. If defense counsel at trial felt that this portion of the charge was inadequate

688

in that it failed to explain fully that Pouncey need not be found guilty of the same offense as Desroe, he bore the duty of requesting further elaboration or clarification. Since he chose not to do so, we are unwilling to say that the members of the court were compelled to find the accused, Pouncey, guilty of unpremeditated murder. If trial defense counsel reached that conclusion, he had a duty to call the law officer's attention to the possible clarification of the law which he thought desirable. Furthermore, in instructing as to the elements of the offense, the law officer advised the court-martial that voluntary manslaughter was a lesser included crime as to either or both of the accused. Certainly, then, the members of that body were well aware of their power to convict Pouncey of that lesser offense if they so desired.

We are equally unimpressed with the argument to support the second reason assigned, namely, that ■■■■■■■ ■ involuntary manslaughter was reasonably raised and that, under the rule laid down in United States v Jackson, 6 USCMA 193, 19 CMR 319, the law officer erred by failing to instruct on that lesser offense as to the accused, Pouncey. In the Jackson opinion, a majority of the Court stated:

"Although we have determined that there is sufficient evidence to support the murder charge as to Jackson, it appears as a reasonable alternative that Jackson was willing to join Burns in an assault, but he did not contemplate or intend that either of them should use a knife. Murder requires an intent to kill or inflict grievous bodily harm. Since Burns used a knife it may be inferred that he possessed the required intent. But is the intent necessarily imputable to the accused? Article 77 of the Code, 50 USC § 671, does not compel such imputation. On the contrary, the court-martial might have found from the evidence that Jackson had no conscious knowledge Burns was carrying a weapon and that he would be inclined to use it. The court-martial could, therefore, reasonably conclude that Jackson did

not share Burns' criminal intent and that his guilt was no greater than that of manslaughter. See Wharton, Criminal Law, 12th ed, § 258, Note 17, page 345."

The distinction between the situation presented in Jackson and the case presently before us is crystal clear. In the former, the evidence established that Jackson did not actively assist Burns in stabbing the victim. The record in that case shows that Jackson was some distance away when the knifing occurred, and the knife used by Burns belonged to the latter. On the basis of the posture of the evidence there, we had no hesitancy in holding that Jackson may well have been liable only for involuntary manslaughter—a degree of criminality considerably less than that attributable to the principal, Burns.

In the case at bar, we are faced with a state of facts which leads unerringly to the opposite conclusion. Testimony established that the fight between Desroe and Gibby was limited at first to the use of fists. There is nothing to indicate that Pouncey had reasonable grounds for arming Desroe with a knife, but as the battle became more heated, Pouncey placed an open knife into Desroe's hand, saying: "You'd better watch him; he has a knife. He will probably do you in." This action, coupled with the accompanying words of encouragement, is itself sufficient to establish that Pouncey intended that Desroe should use the dangerous weapon. Indeed, Pouncey's participation in the affair goes far beyond the stage of sharing the criminal intent and purpose of the perpetrator. He supplied the means for causing death, incited his coaccused to use it, and under the circumstances, could reasonably expect that, in the hands of a man engaged in combat, the knife would probably produce serious wounds resulting in death or grievous bodily harm. In the face of evidence of this nature, we cannot say that involuntary manslaughter was reasonably raised.

Moreover, there is nothing in Pouncey's pretrial statement which suggests that he did not think Desroe would

**689**

use the knife. When asked why he gave Desroe an open blade under such circumstances, Pouncey replied:

"A I told him I had a knife and he told me to give it to him. He said he was going over to help Padgett.

. . . . . .

Q What made you give the knife to Desroe?
A I have no idea.
Q Why did you have the knife open?
A I don't know."

It should be apparent that there is nothing in this record from which it may be inferred that Pouncey did not contemplate or intend that Desroe would use the knife in the manner which he did. If we take Pouncey's statement at face value, he may have believed that a victim other than Gibby would be involved, but that alone would not lessen the degree of his culpability. In such a case, Pouncey's culpability would depend upon Desroe's right to use the weapon, and there is no evidence as to whether Padgett needed such a degree of assistance. We, therefore, hold the lesser offense of involuntary manslaughter was not reasonably raised by the evidence.

IV

In his final claim of error, appellate defense counsel direct our attention to the requested instruction offered by the defense counsel at trial touching on heat of passion. After both sides had concluded the presentation of evidence, defense counsel tendered an instruction which, while inartfully drawn, contained the following principle:

"2. The court is further advised that the law provides that provocation sufficient to produce a heat of passion and resulting in the absence of malice may be produced by fear as well as rage, and this may give such character to a homicide as to make it manslaughter. . . ."

The law officer refused to give the proffered statement, and defense counsel promptly objected. It is now urged that by his action, the law officer abused

his discretion to the prejudice of both accused.

In past cases, we have criticized law officers for refusing to give requested instructions which are relevant and tend to highlight issues involved in the case. United States v Phillips, 3 US CMA 137, 11 CMR 137. In the case at bar, defense counsel presented the law officer with a typed copy of a request which contained in simple terms the legal principle that heat of sudden passion may be engendered by fear. The request was refused, and accused is in a position to complain if the proposed instruction was sufficient to put the law officer on notice that some sort of charge incorporating this suggestion was essential to a proper disposition of the case. See United States v Burden, 2 USCMA 547, 10 CMR 45. We believe the law officer went only part way on the theory underlying voluntary manslaughter, as he instructed the court-martial that that offense involves an unlawful killing in the heat of sudden passion caused by adequate provocation. He implemented his language with pertinent Manual provisions and gave illustrations of instances of adequate provocation. However, nowhere in the voluntary manslaughter charge did he advert to the theory that heat of passion may be engendered by fear. In normal parlance, it is undoubtedly understood that "heat of passion" refers to some form of anger or rage, and the whole thrust of the instructions was toward a provocative act which might have aroused rage, resentment, or fury. We sense in the instruction just the antithesis of an emotional agitation caused by fear. We might emphasize the point in the following manner: Courts of law are frequently met with a contention that a killing caused by rage is inconsistent with a claim that the killer was motivated by a fear for his own life. See Kinard v United States, 96 F 2d 522, 526 (CA DC Cir) (1938). Yet it has been settled that voluntary manslaughter and self-defense are not inconsistent. That result is reached on the theory that fear may either produce passion or a reasonable belief that death is imminent. Steven-

son v United States, 162 US 313, 16 S Ct 839, 40 L ed 980 (1896). Thus, we are unwilling to say that the law officer's use of the term "heat of passion caused by adequate provocation" was sufficient to bring home to the triers of fact the legal principle that fear, as well as anger, may reach that uncontrollable state which will reduce murder to manslaughter. Nor can it be said that the requested charge did not point up that theory. Although we have never passed precisely on the question, this Court has observed that in determining whether an unlawful killing was committed in the heat of passion caused by adequate provocation, fear may be sufficient to excite uncontrollable passion. United States v Adams, 5 USCMA 563, 18 CMR 187. And this statement of the law is in direct accord with the Federal rule that heat of passion may be produced by fear as well as by rage. Stevenson v United States, supra; Kinard v United States, supra. This principle is impliedly recognized by the Manual, which lists a grievous assault and battery as an example of adequate provocation. Manual for Courts-Martial, United States, 1951, paragraph 198a, page 354. Surely such an act is as likely to arouse fear as rage. In addition, the Government concedes that the rule set forth above is an accurate statement of the rule to be found in the Stevenson and Kinard cases. We are, therefore, sure that by his refusal to give the requested instruction, or one of substantially similar import, the law officer deprived the accused of a theory of defense which, in view of the nature of the evidence, would have been of incalculable benefit to them. Thus, in view of the specific request and the objection to the refusal to comply with it, we must hold that the law officer erred unless the issue of fear was not raised reasonably by the evidence.

We encountered little difficulty in concluding that the record contains sufficient evidence to raise the issue. Testimony established that the deceased was a powerful man, well over six feet tall and weighing some 190 pounds. On the other hand, the accused, Desroe, was approximately five feet eight inches tall and tipped the scales at no more than 150 pounds. Desroe testified that he was fearful of Gibby and that he was being literally choked to death. And to this evidence must be added the testimony throughout the record which brands the deceased as the aggressor, who provoked the fray by a vicious assault upon Desroe. Considering all the circumstances as a whole, we have no hesitancy in concluding that the evidence raised reasonably an issue of voluntary manslaughter based on fear. While the court-martial was afforded an opportunity to consider Desroe's fear of the victim as relating to the defense of self-defense, and found against the accused, a finding for him on that issue would have exculpated the defendant of all offenses. The court-martial members might not have been willing to free the accused entirely, but had they been advised properly on voluntary manslaughter, they might have been willing to reduce the offense to that degree of homicide. It, therefore, does not follow that, even though they had known fear could operate in another area, a finding of voluntary manslaughter would not have been returned.

V

The decision of the board of review is reversed, and the record of trial is remanded to The Judge Advocate General of the Army. A board of review may affirm findings of voluntary manslaughter and affirm an appropriate sentence, or a rehearing on charges of unpremeditated murder may be directed.

Chief Judge QUINN concurs.