UNITED STATES, Appellee

v

WILLIAM KENTUCKY, JR., Private E–1, U. S. Army, Appellant

8 USCMA 553, 25 CMR 57

554

No. 9740

Decided January 3, 1958

*First Lieutenant Arnold I. Melnick* argued the cause for Appellant, Accused. With him on the brief was *Colonel Edward M. O'Connell.*

*First Lieutenant Thomas M. Lofton* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of unpremeditated murder and assault with intent to inflict grievous bodily harm, in violation, respectively, of Articles 118 and 128, Uniform Code of Military Justice, 10 USC §§ 918, 928. On this appeal he contends that he was prejudiced by three errors in the law officer's instructions to the court-martial.

At the trial the accused admitted that he and several members of his organization were ejected from the noncommissioned officers club of a different unit. As a result, the accused first stabbed one man in the back and, shortly afterward, stabbed another in the chest. The latter person died. One of the members of the accused's group testified that, as he and the accused ran from the area of the second incident, the accused remarked to him, "I got me two of the son-of-a-bitches." While waiting for their "pass truck" the accused continued "bragging to us about what he had done." En route to their company, the accused threw his knife into a rice paddy beside the road.

In his own testimony the accused maintained that he did not intend to kill or to hospitalize the man he stabbed in the back. He "just intended to stop him" and he "cut him without thinking." He was "mad, frightened and scared all together." He accounted for the second stabbing substantially as follows: A few minutes after his ejectment from the club and the first stabbing, he and some of his fellows proceeded to the main road. They passed a drop bar gate which extended across a street in the company compound a short distance from the club. The accused heard someone behind him say, "Let's get them." He turned around and saw four or five men coming toward him. One of them was in a crouch and "looked like he was going to come under the gate." The accused stepped back to the gate and "cut [the man] without thinking." He was afraid that if the on-coming men "had got to me . . . they would have done more than beat me."[1] Other witnesses, however, testified that they did not hear anything said by the decedent; that the decedent was merely standing on the inside of the gate bar when he was stabbed; that the accused struck the blow with a downward motion starting from a position at about his right shoulder, and

---

[1] In a pretrial statement which was admitted in evidence, the accused gave a different version of the incident. He there said that, as he left the area, several men came running up and "wanted to start another fight. They *were standing on the inside* and I was on the outside of the bar. I was standing about one step away, I took my knife out of my pocket and opened it, took a step toward the bar and *stabbed a man standing at the bar*. I turned around and walked a few steps and then started to run toward Uijongbu." [Emphasis supplied.]

that the autopsy showed that the knife travelled downward on the right side of the victim's chest.

Testimony from a qualified psychiatrist was also presented. The doctor testified that he had examined the accused for a period of three or four days. He diagnosed the accused as a "Schizoid Personality" which means that he has a "kind of mental defect . . . classified as a behavior disorder." This condition made it more difficult for the accused to grasp "reality" and show his actual emotions, but it did not, in the doctor's opinion, impair his ability to distinguish right from wrong or to adhere to the right at the time of the commission of the offenses. The doctor admitted, however, that tension could build up in the accused to the point where he would be incapable of "handling" the situation in which he found himself.

The law officer opened his instructions with the following statement:

"Gentlemen of the court: This has been a lengthy trial and I wish to commend the court members for their kind attention throughout the proceedings. I wish to also commend counsel for their diligent efforts on behalf of their respective causes. I wish to state at the outset that the Government and the accused come into this courtroom on the same plane and each is entitled to the same fair and impartial treatment at your hands."

The accused maintains that these remarks are incorrect and that they had the effect of depriving him of the presumption of innocence.

In retrospect, the phrase "on the same plane" can be considered inartful but in the context in which it █ was used it was not wrong. From the standpoint of fairness, it is, of course, correct that the Government and the accused are "on the same plane." That is the only idea the law officer attempted to convey in his opening remarks. We believe that they were so understood by the court members and the trial personnel. See United States v Johnson, 3 USCMA 447, 13 CMR 3.

In his instructions on the murder charge the law officer, in part, advised the court-martial that:

". . . A person is presumed to have intended the natural and probable consequences of an act purposely done by him. Hence, if a person does an intentional act likely to result in death or great bodily injury, he may be presumed to have intended death or great bodily injury."

The accused contends that this instruction is erroneous because it █ asserts a presumption of law rather than a simple inference of a fact which need not necessarily be drawn by the court members. He argues that, since the stabbing and the resultant death were admitted, the only issue was the accused's intent, but the instruction effectively precluded any real consideration of this issue by the court members. The difficulty with this argument is that it overlooks another part of the law officer's instruction in which he referred to the matter of intent. He said:

"Much has been said about intent. Intent ordinarily cannot be proved by direct evidence unless, for example, the accused has been overheard to make a statement of his intent. You are advised, however, that intent may be proved by circumstantial evidence, that is, by facts and circumstances from which, alone or in connection with other facts, you may, according to the common experience of mankind, reasonably infer the existence of an intent."

Considering the two instructions together, we believe that they "allowed the court-martial full discretion to accept the presumption or reject it according to their experience." United States v Miller, 8 USCMA 33, 23 CMR 257. Accordingly, we find no merit in the accused's second claim of error.

Finally, the accused contends that he was prejudiced by the law officer's refusal to give one of several instructions requested by his counsel. The requested instruction is as follows:

"You are further advised that acts which would otherwise constitute

murder, constitute only the lesser included offense of voluntary manslaughter if such acts were done with the absence of malice aforethought. The law recognizes that certain situations arise by which an accused kills because he thinks he is in danger of death or grievous bodily harm, although such belief is an unreasonable one, and the circumstances did not warrant such belief in the eyes of a reasonable man; in such a case the accused acts out of great fright or terror and not from malice aforethought. While the law does not excuse the homicide because of this unreasonable belief, it does not hold him guilty of murder.

"Consequently, in order to find the accused guilty of murder, you must be satisfied beyond a reasonable doubt that the accused was *not* under the belief, though unreasonable, that he was in danger of death or grievous bodily harm. However, if you do have such doubt, you may find the accused guilty of voluntary manslaughter in the event you are satisfied beyond a reasonable doubt that the alleged killing, although it may have been done while the accused believed that he was in danger of death or grievous bodily harm, was nevertheless done without justification or excuse and with intent to kill or inflict great bodily harm."

The crux of the requested instruction is the part which provides that if the court-martial finds that the accused acted from a belief, however unreasonable, that his own life was in danger, the offense is manslaughter, not murder.

An intentional killing without justification or excuse is murder. Article 118, Uniform Code of Military Justice, 10 USC § 918. However, the same act committed in the "heat of sudden passion caused by adequate provocation" is voluntary manslaughter. Article 119, Uniform Code of Military Justice, 10 USC § 919. The passion prompting the homicide may be fear. United States v Desroe, 6 USCMA 681, 690, 21 CMR 3. However, the presence of passion induced by fear does not re-

duce murder to manslaughter by itself; adequate provocation for the passion must also be present. Appellate defense counsel concede that adequate provocation consists of such circumstances as would excite an "uncontrollable passion in the mind of a reasonable man." United States v Lee, 4 USCMA 571, 576, 16 CMR 145; United States v Black, 3 USCMA 57, 11 CMR 57. Nevertheless, he contends that the rule is not "immutable" and that a distinction should be drawn between passion engendered by rage and that produced by fear. As to the latter, he argues that regardless of reasonableness of the cause, it is sufficient if the accused's fear is honest.

At the outset, we note that appellate defense counsel's argument is different from the requested instruction. The latter does not mention an honest belief, but refers only to the "belief" that the accused was in danger. The variance is substantial. See Jackson v United States, 48 App DC 272, 277 (CA DC Cir) (1919). However, the request was sufficient to put the law officer on notice, and, under military law, that is enough to preserve the issue for our consideration. United States v Short, 4 USCMA 437, 16 CMR 11; United States v Phillips, 3 USCMA 137, 11 CMR 137.

Turning to the argument itself, we are not persuaded that multiple standards should be used to judge the adequacy of provocation. In fact, some of the very cases relied upon by defense counsel argue for a single test. In Allison v State, 74 Ark 444, 86 SW 409, 413, one of the principal cases cited by the accused, the defendant also maintained that, when he killed, he acted from fear. Judge Reddick, writing the opinion for the court, noted that if a person kills "from an honest belief that it is necessary to protect himself . . . even though he formed such conclusion hastily and without due cause," the offense may be manslaughter instead of murder. But he took pains to point out that the belief alone is insufficient. In addition, there must be "some grounds" for the belief. "The provocation," Judge Reddick said, "must be such as will *ordinarily arouse the passions of men,* and such as is calculated to throw them off their guard and cause

them to do such deeds." (Emphasis supplied.) Id. at 414. In Kinard v United States, 96 F2d 522 (CA DC Cir) (1938), the Court of Appeals for the District of Columbia also considered the legal effect of passion founded on fear. The court there said (page 526):

". . . Heat of passion may be produced by fear as well as by rage . . . and, *if the provocation therefor is adequate* (Jackson v. United States, 48 App. D. C. 272), the resulting killing may be manslaughter." [Emphasis supplied.]

In the *Jackson* case fear was the motivating passion. Speaking of the adequacy of provocation, the court said (page 278):

"Furthermore, the fact that a person commits homicide under the influence of passion is not enough to reduce his crime to the grade of manslaughter. He must show in addition that there was a sufficient cause of provocation for his passion. 'If there be provocation without passion, or passion without a sufficient cause or provocation, * * * the killing will be murder.' *M'Whirt's Case,* 3 Gratt. 594, 606, 46 Am. Dec. 196, and cases cited. 'It matters not how violent may have been the slayer's passion, it will not relieve him of the implication of murder unless it was engendered by *a provocation which the law recognizes as being reasonable and adequate.*' 13 R.C.L. sec. 96, p. 791 . . . . And the 'question, as it arises in nearly all cases, is one of fact for the determination of the jury.'" [Emphasis supplied.]

Our own cases also support the conclusion that the adequacy of provocation does not depend upon the nature of the passion engendered in the accused. United States v Desroe, supra; United States v Adams, 5 USCMA 563, 18 CMR 187; United States v Black, supra. In the *Black* case we said:

"The distinguishing elements of this offense [voluntary manslaughter] are *heat of passion,* and, *adequate provocation.* . . . these elements [must] co-exist, and neither passion alone, however violent, nor provocation alone, however adequate, will suffice. . . . Assuming the truth of each statement made by the accused in explanation of his actions, we conclude that neither of the distinguishing factors of voluntary manslaughter were shown. . . . There remains, then, only the claim that Lewis jumped the accused, thus precipitating the fatal shooting. Without reference to the other facts such a move *was insufficient to excite in the mind of a reasonable man an uncontrollable passion.*" [Emphasis supplied.]

Accordingly, we find no merit in the accused's contention that the refusal to give the requested instruction was error. The decision of the board of review is affirmed.

Judge FERGUSON concurs.

Judge LATIMER concurs in the result.