UNITED STATES, Appellee

v

JOHNNIE W. MAXIE, Airman Second Class,
U. S. Air Force, Appellant

9 USCMA 156, 25 CMR 418

No. 9882

Decided April 18, 1958

*Major George M. Wilson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ellis L. Gottlieb.*

*Captain John W. Fahrney* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James R. Thorn* and *Lieutenant Colonel Francis P. Murray.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial upon the charge of premeditated murder, in violation of

Article 118, Uniform Code of Military Justice, 10 USC § 918. The court returned findings of guilty of the lesser included offense of unpremeditated murder and sentenced him to dishonorable discharge, total forfeitures, and confinement at hard labor for twenty years. Intervening appellate agencies having affirmed, the accused petitioned this Court for review. The petition was granted so that we might pass on the following issue:

"Whether the law officer should have instructed that if the court found the accused killed without malice and under apprehension of danger but that his apprehension was not reasonable, it might return a finding of voluntary manslaughter."

The court was instructed on the elements of voluntary manslaughter as a lesser included offense of the crime charged. The instructions were complete and full unless the law officer's rejection of an instruction proposed by trial defense counsel which set out the principle outlined in the above-quoted issue was error. Instead of granting the requested instruction, the law officer advised the court that the killing must have been done in the heat of sudden passion caused by adequate provocation, stating,

". . . To be adequate, the provocation must be such as would excite uncontrollable passion in the mind of a reasonable man. . . ."

The instruction requested expounded the concept of imperfect self-defense, which is distinguished from the perfect variety only in that there is an unreasonable, though honest and bona fide, belief of the necessity of killing to protect one's bodily integrity. Self-defense itself exculpates all taint of criminality in an act of homicide because it is founded upon a reasonable apprehension that death or serious harm is imminent at the hands of the one killed. The instructions on that aspect of the crime are not questioned, but appellate defense counsel go further and contend that if the triers of fact were to believe an imperfect self-defense was established, the killing would not be malicious and a finding greater than voluntary manslaughter could not be returned. The claim is made that an instruction on this principle was warranted in this case.

In United States v Black, 3 USCMA 57, 11 CMR 57, we rejected the theory of imperfect self-defense because it needlessly confused the established marks of distinction between the two crimes of murder and manslaughter. See also United States v Kentucky, 8 USCMA 553, 25 CMR 57. That doctrine, if accepted, would not exculpate but it would permit the crime of murder to be reduced to voluntary manslaughter when the homicide was not committed in the heat of sudden passion caused by adequate provocation. Again we see no point in that departure for, under our present doctrine, there is adequate protection for one who intentionally kills another. If a homicide is committed, an accused may be excused if he has reasonable ground to believe his life or body is in grave danger. And if he intentionally kills under the heat of passion caused by adequate provocation, the crime is no more serious than voluntary manslaughter. Military law extenuates under those circumstances because of the frailties of human beings, but it measures the conduct by a reasonable man standard. That is as far as most laws go, and we are not prone to adopt a theory which permits a reduction to voluntary manslaughter merely because a person concludes unreasonably to take a life.

In Jackson v United States, 48 App DC 272 (1919), the Court of Appeals for the District of Columbia apparently accepted the doctrine of imperfect self-defense but defined an honest, albeit unreasonable, apprehension as "one which has some basis on which to rest, although the person entertaining it neglects to consider all the circumstances at hand and which ought to be taken into account by him." In referring to "some basis," if the court evoked a standard that an unreasonable belief that death or bodily injury was imminent was sufficient to reduce murder to manslaughter, then the holding is contrary to the views we ex-

pressed in United States v Black, supra, and we expressly decline to follow that principle.

The presence of malice is the element in murder which differentiates that crime from manslaughter. However, in United States v Bartholomew, 1 USCMA 307, 3 CMR 41, we observed that it was distinctly doubtful that an instruction to the court on voluntary manslaughter was warranted outside of two situations. They were: (1) a killing which was done in mutual combat upon a sudden quarrel, and (2) a killing in which the accused was subjected to such provocation by the deceased as to cause hot blood or passion, as a result of which his reason was so disturbed or obscured that he acted rashly, without deliberation or reflection and from passion rather than judgment.

In considering the second situation set out above, we later dealt with a mental condition brought about by fear in United States v Desroe, 6 USCMA 681, 21 CMR 3. We there held that provocation may create an uncontrollable fear in the accused which in turn causes him to kill in the heat of passion. But we were careful to limit the provocative acts to those which would cause terror in the mind of a reasonable person. Under that doctrine, we treated fear as the equivalent of rage, passion, anger or resentment. But that is not to say that fear sufficient to negate malice could be that created in the mind of an unreasonable man or founded on any provocation, adequate or inadequate. Any such standards would be disastrous in the uncertainty of their application. In addition, a rule based on those hypotheses would be a refuge for individuals who become fearful upon the slightest provocation; it would put a premium upon lack of ordinary courage, and would favor the excessively cowardly man. We, therefore, do not accept the doctrine that heat of passion based on fear need not be created by adequate provocation.

In support of their last contention, appellate defense counsel claim the evidence raises reasonably the theory that fear sufficient to terrorize a reasonable man was created by adequate provocation and that it was error for the law officer not to single out that theory in his instruction. True, the issue was not emphasized, for the law officer's charge on voluntary manslaughter failed to mention that particular hypothesis. Here, as in United States v Desroe, supra, the thrust of the charge was toward acts naturally calculated to effect rage, resentment, or fury in a reasonable man and there was no mention of fear, terror, or the like. The Desroe case, supra, decided that if there was a request for the inclusion of fear and that issue was reasonably raised by the evidence, the law officer erred if he failed to cover the subject. To complete the argument, defense contends that the proposed instruction on imperfect self-defense is construable as a specific request that the law officer inform the court that the motivation for the heat of sudden passion may be fear. We doubt that under the wording of the instruction, the law officer was, or should have been, put on notice that the defense desired the issue of fear to be specially mentioned in his charge on voluntary manslaughter. However, for the purposes of this case, we are willing to assume that he should have been alerted to that theory. Accordingly, we must appraise the evidence to determine whether the issue was reasonably raised.

The scene of the fatal shooting was one of two rooms, screened off with partitions from an otherwise open-bay quonset hut. This room belonged to the accused in his capacity as barracks chief, and the victim lived in the same building. Prior to the fatal incident, the accused and the deceased had been on friendly terms. Some short time prior thereto, they had a mild argument after the accused had been refused a loan of a thousand francs. The altercation took place at a beer bar in a building adjacent to the barracks. The deceased was much the larger of the two men and much the younger. He began teasing the accused and punctuating his comments with repeated finger pokes in the accused's ribs. The accused left the bar to prepare for his later tour of duty as an air policeman.

The deceased departed about an hour later and shortly after his leaving the bar the two were observed arguing at the door of the barracks. After this dispute, the accused went to his room followed by the deceased, who made derisive remarks from the open bay, at one time placing an air police brassard on his arm, entering the accused's room and stating that he was just as good an air policeman as the accused. The accused told him to leave, and the deceased complied. Thereafter, the accused left his room for the orderly room to draw his police gear, but the deceased overtook him, challenged him to fight, and pushed him with the heel of his hand. This appeared to be a playful incident on the part of the deceased according to the testimony of one bystander, but not to the accused for at this point he threatened to kill the deceased. The latter returned to his barracks, and the former proceeded to the orderly room and drew a .45 caliber pistol, ammunition, and a billy club. As he returned to his barracks, a member of the command told him to "cool down." The accused smiled and replied that he wasn't going to do anything. He tried to use the telephone in the barracks but could not over the din of loud conversation engaged in by the deceased. The victim persisted despite accused's request to be quiet, and the latter left the barracks. He proceeded back to the orderly room and there delivered a letter addressed to his commanding officer, but the commander did not become aware of the contents until after the shooting. The message therein was:

"This day, Saturday, eving [sic] 21 July 56 I was not doing anything and A/3C Mattison was drinking and got mad at me for no reason at all and I was ready with my A.P. gear on and he hit me twice and I did not hit him at all, so what happens to me please let my wife know about it, please do —"

After delivery of the letter, the accused returned to his barracks and entered his room. The bickering continued, and the accused made reference to going on duty and stated that the matter would be settled after his relief. The deceased replied that he would be ready even though it might be 2:00 o'clock in the morning. Other airmen present urged the deceased to stop taunting the accused. He, however, walked up to the door of the accused's room, opened it, and started to enter. He commenced a sentence which was not finished for the accused was heard to say that he had taken all he could take, a shot was fired, and the deceased fell in the doorway, mortally wounded.

The accused elected to testify on his own behalf, and his version of the early events leading up to the shooting are substantially as we related above, with the exception that he claimed the deceased had threatened to kill him at the time he had gone to the orderly room to pick up his gear. We quote his statement of events immediately prior to the shooting:

". . . I returned, went into my room, finished getting my equipment, my clipboard and gloves; and at that time Airman Mattison [the deceased] was still raving, and Airman Ruth told Airman Mattison—said 'That's all words; lets see some scars'. I had just laid my clipboard and gloves and all on my bunk. I was fixing to close my wall locker, when Airman Mattison came to my room. He said—when Airman Ruth told him 'That's all words; let's see some scars', Airman Mattison repeated 'I will show you some scars'; and he came towards my room. At that time, I did not know whether he was coming in my room or not, but he opened my door—flung the door open fast like. His left hand was on the door facing—of the door—side, and he had turned the door loose with his right hand and run his right hand in his right pocket, and he looked at me and said 'I will fix you now' in a split second, and I drawed my weapon and threw a load in. I said 'Stop, Mattison'. At the same time he had started to make a step towards me, coming into my room, and started to move his hand out of his pocket—and I fired. I fired for the flesh part of his leg. After that—I don't remember what happened until about half an hour when I was leaving Major Broesamle's

office and it started coming back to me where I was at."

The accused then recounted four prior instances in his personal knowledge of the deceased's threatened use of a knife against various persons. He testified that he thought the deceased was going to pull a knife from his pocket; that he was afraid of the deceased, who had threatened to kill him; and that he believed he was going to get cut with a knife. However, he stated he did not see a knife at any time. Other evidence in the record indicates that the deceased did not have a knife on his person, but in a fatigue uniform found among the deceased's belongings was a boy scout type pocketknife.

From the evidence we have recounted of the teasing, taunts, and bullying of the accused by the deceased, and of deceased's obnoxious behavior calculated to arouse the accused's ire, there is a showing that deceased had gone out of his way to annoy and irritate the accused. However, nothing done prior to the deceased's final entry into the accused's room constituted adequate provocation to engender that uncontrolled fear or anger in the mind of a reasonable person which will reduce a murder to manslaughter. Insulting or abusive words or gestures, taunts, a slight blow with the hand or fist are not, standing alone, considered adequate provocation. Allen v United States, 164 US 492, 17 S Ct 154, 41 L ed 528 (1896); United States v Edwards, 4 USCMA 299, 15 CMR 299.

With reference to the events surrounding the shooting itself, they, of course, must be considered with all that has gone before to determine whether in the totality of evidence the conduct on the part of the deceased would arouse an uncontrollable fear in the mind of a reasonable man. In other words, the fear must have been engendered by acts sufficient to provoke a reasonable man and have existed to a sufficient extent to render the mind of a person of ordinary temper incapable of cool reflection. Taking the accused's

testimony, the deceased opened the door and started into the room; he reached in his pocket and voiced his intent to injure the accused. The latter drew and loaded his revolver. Told by the accused to stop, deceased moved forward a step and the accused noted a movement of the deceased's hand. At this point the accused fired, aiming at the flesh part of the deceased's leg. That testimony does not show a mind befuddled by sudden horror, fear or terror. It shows no more than a calculated effort to slow up an anticipated attack; at best a reasoned belief that protective measures were desirable.

But there is more to show the killing was not committed in the heat of sudden passion. The past history of the two men does not show any hostility but on the contrary, that they were friends. Nor is there one instance of injury to the accused. At the moment he shot, accused was across the room from the deceased, who was unarmed, and too far away to so much as touch him. The accused had a police club to use in his defense rather than the revolver and he could have sought the aid of at least four servicemen in the barracks who were in no way hostile to him. Added to this we have evidence that the victim had been requested earlier in the day to leave accused's room, and that he had complied without incident. While earlier that day the victim had poked accused in the ribs with his finger and shoved him, most of this was not in a serious manner, and any threats of serious harm were conditioned upon accused's relief from police duty. No doubt arises about accused being justly annoyed over the foregoing misconduct, but unfortunately for him his own behavior shows a preconceived plan to kill the deceased. Certainly, when time and circumstances permit an accused to reflect on the killing of a victim, that mental state of fear which will reduce murder to manslaughter is not present. Here the accused knew prior to the killing that he intended to put an end to the victim's taunts. He cogitated sufficiently well that he penned a note to his commanding officer informing the latter to notify his wife when the tragedy

**161**

had ended. He took the time to deliver the letter in person, arm himself with both a lethal weapon and a police club and then shot the victim when he appeared at the door. He had expressed an intent to kill, he failed to seek help from other service personnel who he knew were present in the barracks, and at no time prior to the killing did he exhibit any fear of the victim. He had suffered no violence at the hands of the deceased, and the record fails to show reasonable grounds for him to be terrorized. He may have been provoked, but his mental state was that of a man bent on putting an end to his tormentor, not because of fear or terror but because he would stand no more taunting. His theories of self-defense and heat of passion were submitted to the court-martial, and they were resolved contrary to his contention. Any other theories are not raised by the evidence. Accordingly, the law officer did not err in his instructions to the court-martial.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

The issue in this case as I view it is simply whether or not the law officer should have given the following requested instruction:

"The question to be determined is whether the accused under all the circumstances as they appeared to him honestly believed that he was in imminent danger of losing his life or of suffering great bodily harm and that it was necessary to do what he did in order to save himself from such apparent threatened danger and it is not whether a reasonable man or a man of reasonable courage would have so believed."

Without considering the correctness of the principle enunciated in this instruction, I believe the theory upon which it is based is inapplicable under the factual setting of the instant case. Furthermore, I am satisfied that the law officer adequately and correctly instructed the court on the principal offense, the lesser offenses of unpremeditated murder and voluntary manslaughter, and the affirmative defense of self-defense. These instructions sufficiently incorporated all the issues raised upon which the accused was entitled to have the court-martial instructed. Accordingly, I concur in the result reached by the Court.