UNITED STATES, Appellee and Cross-Appellant

v

JOHN K. JUDKINS, Private, U. S. Marine Corps,
Appellant and Cross-Appellee

14 USCMA 452, 34 CMR 232

*Lieutenant Colonel John R. DeBarr,* USMC, argued the cause for Appellant and Cross-Appellee, Accused. With him on the brief were *Lieutenant Colonel Charles B. Sevier,* USMC, *Lieutenant Commander Paul J. Fisher,* USN, and *Lieutenant Thomas J. Hilligan,* USNR.

*Major Daniel F. McConnell,* USMC, argued the cause for Appellee and Cross-Appellant, United States. With him on the brief were *Lieutenant Colonel D. E. Holben,* USMC, *Lieutenant (jg) H. D. Campbell,* USNR, and *Lieutenant (jg) L. G. Logan,* USNR.

## Opinion of the Court

KILDAY, Judge:

Accused was tried by general court-martial, convened at Camp Pendleton, California. He was charged with having left his post as sentinel before being regularly relieved therefrom, in violation of Article 113, Uniform Code of Military Justice, 10 USC § 913; of failure to obey a certain order of the Area Commander by partaking of alcoholic beverages during certain proscribed hours, in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892; and unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He entered a plea of not guilty to all of the charges and specifications. He was convicted as charged. He was sentenced to be discharged from the service with a dishonorable discharge, to forfeit all pay and allowances, and to be confined at hard labor for fifteen years. The convening authority approved the findings and sentence.

A board of review in the office of The Judge Advocate General of the Navy affirmed the findings of guilty as to the first two charges and their specifications. As to the charge of murder, the board of review affirmed only the lesser included offense of voluntary manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 USC § 919; and only so much of the sentence as provides for a dishonorable discharge, confinement at hard labor for four years, and forfeiture of all pay and allowances.

Accused petitioned this Court for a grant of review alleging "the insufficiency of the evidence to sustain the court's conviction of the accused on the charge of unpremeditated murder." Subsequent to the filing of such petition for review, the Acting The Judge Advocate General of the Navy, pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, certified the case to this Court on the following issue:

"Was the Board of Review correct in holding that, under the circumstances of this case, the Law Officer erred by failing to sua sponte instruct on the issue of voluntary manslaughter?"

This Court granted review on the following additional issues:

"1. Whether the accused was prejudiced by the board of review reducing the findings on the Additional Charge to voluntary manslaughter, as a lesser offense raised, when such lesser offense had not been submitted to the court-martial.

"2. Whether it was correct to instruct (R 198):

"* * * that the killing of a hu-

**453**

man being is unlawful when done without justification or excuse. In the absence of any evidence that the killing was justified or excusable, the court is entitled in inferring that such killing was unlawful.'

"3. Whether it was correct to instruct (R 199):

'In determining whether the actions of the accused were reasonable in this case, you should consider all the facts and circumstances in the case, except his condition or degree of intoxication, as I will explain later. * * *'

* * * *

'The court is advised that voluntary drunkenness is no defense to the charge of unpremeditated murder. Likewise in self-defense the effect of prior voluntary drunkenness should not be used in determining whether the accused was, in fact, in reasonable fear of immediate death or serious bodily injury. A person who is drunk or under some influence of intoxicating beverages may react differently when confronted with a dangerous situation than he would if he was sober. This would not entitle him to use any greater force than he would have been entitled to use if he was sober. Thus, you should measure whether the accused was in fact and on reasonable grounds in fear of imminent death or serious bodily injury without regard to his condition or degree of intoxication.' "

The accused, Judkins, and the deceased, Kraps, both privates in the Marine Corps, were scheduled to go on post as sentinels at midnight. Notwithstanding accused's knowledge of an existing order forbidding drinking of alcoholic beverages twenty-four hours prior to going on post, accused and deceased drank beer in an enlisted men's club, with two companions, from about 6:30 p. m. until about 10:30 or 10:45 p. m., leaving shortly before the club closed. A substantial quantity of beer was consumed. While accused testified that he did not think he was drunk or intoxicated, but feeling kind of high, while at the club, the record indicates that both accused and the deceased were intoxicated to a very high degree at the time they left the club and continued to be intoxicated during all of the time involved in this tragedy.

Shortly after leaving the club, deceased, without any provocation or warning, struck the accused from the rear, knocked him to the ground, and proceeded to pummel accused's head against the cement. Deceased was pushed away from accused and immediately apologized. Shortly thereafter, with the accused present and viewing the incident, deceased approached an area at which three sentries had congregated. Deceased seized the rifle of one of the sentries, backed up, put a round in the previously empty chamber of the rifle, and pointed it at the three, with the safety off. At gunpoint, deceased forced another of the sentries to lay down his rifle. Accused was ordered by deceased to apologize to and shake hands with all of the sentries, and accused complied. After some minutes deceased was persuaded to surrender the rifle. Thereafter accused and deceased proceeded to their barracks and prepared for guard duty. Apparently due to his drinking, deceased was unable to sign for his ammunition. Accused and deceased were posted by the corporal of the guard on adjacent posts, each armed with an M-14 rifle and each supplied with ammunition. A third sentry was posted in an adjoining area. After the three congregated at a place where the three posts converged, the third sentry continued to walk his post and accused proceeded to a telephone booth to make a long-distance call to a family friend. Accused testified that while in the telephone booth he observed deceased about ten feet outside the booth with his rifle pointed toward accused. Accused further testified that the appearance of deceased at that time caused him to fear that the deceased proposed to shoot him, and that he informed the friend he was phoning that his " 'best buddy is going to shoot me.' " Accused left the telephone booth and warned another marine whom he met not to venture into deceased's area, in-

forming him there might be some trouble. Accused, however, proceeded into that area, stating his purpose to be an attempt to keep deceased out of further trouble.

The third sentry testified that he observed the deceased coming from the general area of the telephone booth about the time detailed by the accused. This witness also testified that deceased went to a fence, leaned his rifle against the same, and laid himself on the ground. The witness attempted to awaken deceased and called his attention to noise he had heard in the area in which gasoline was stored on deceased's post. Deceased asked for and received his rifle. Thereupon accused identified himself, approached the place where deceased was lying on the ground, placed his own rifle against the fence, and attempted to get deceased to his feet. Accused directed the third sentry to secure coffee for deceased and the latter departed the scene to accomplish that purpose. Thus, only accused and deceased remained at the site of the subsequent killing.

Accused testified that at that time he walked up and down urging deceased to walk his post, admonishing that if he did not he would get in trouble, and that deceased finally agreed. He continued his importunities to the deceased, to the end that both might avoid difficulty, and accused finally agreed to walk the post once with deceased, so that the latter should then be awake on his feet and would be all right the remainder of the evening. Deceased said " 'Okay.' " Accused further testified that he went to pick up his own rifle and while doing so he heard the action of another rifle being manipulated and also heard deceased say " 'I'll kill him. I'll kill him.' " Accused continued to testify as follows:

". . . Well, just as I heard that, I had already started to reach for my rifle and I looked to my left and I'd seen Aus had just finished going over a little fence between Post 2 and Post 3. He took a step and hesitated and I had my rifle in my hand and I was starting to stand up again. And, he was—he hesitated and was in a kind

of a crouched position at Port Arms, like he would be practicing bayonet fighting or something. Then he started to turn to his left, toward me to his left. At the same time I saw this, I saw the muzzle of his rifle and I then—it was all in one motion. Its [sic] hard to explain exactly what took place, but as I brought my rifle up, I hit the operating rod handle, pushed the safety forward, and pulled the trigger and then I dropped my rifle muzzle toward the ground. And then, that's the last thing that I remember."

Several witnesses testified they found accused at the site of the killing in a highly emotional state. Deceased was found on the ground. At or near his body was his rifle covered with blood. Subsequently he died from the effects of a projectile entering the back and side of his head and passing out through the top frontal area. The autopsy on deceased confirmed that he had been highly intoxicated at the time of his death.

Accused testified that during his friendship with deceased he had told him of three incidents in Okinawa in which he, the deceased, had been involved in acts of violence. Deceased had told him of an instance in which he had fought six police officers in Phoenix, a bar patron in San Francisco, and a police officer in Oceanside, California. The last named officer testified at this trial that deceased had assaulted the officer when he attempted to arrest a companion of deceased, and at that time deceased had apparently been drinking. The defense also placed in evidence a page from deceased's service record book showing that in May, prior to deceased's death in December, he had been convicted by summary court-martial of three specifications of violation of Article 128, Uniform Code of Military Justice, 10 USC § 928, by pointing at three different service members "a dangerous weapon to wit: a submachine gun Cal. .45 M3A1."

Accused testified that at the time he observed deceased turn and the muzzle coming toward him, he "was just scared. I don't think I've ever been

that scared before." He continued, "I was scared of getting shot. I just didn't want to die at that time." He did not think he had time to form doubts in his mind when this occurred, and in fact did not "have time for much of anything."

The law officer instructed the court-martial on the law of murder and self-defense. He did not instruct on the law of voluntary manslaughter. This failure was assigned as error before the board of review and was sustained by it. Therefore, the board affirmed only so much of the findings as convicted accused of voluntary manslaughter and reassessed the period of confinement from fifteen to four years.

## I

The first issue we consider is the one certified to us by The Judge Advocate General. It inquires whether the board of review was correct in holding that, under the facts of this case, the law officer erred by failing to instruct *sua sponte* on the issue of voluntary manslaughter.

In reaching its conclusion the board of review cited United States v Desroe, 6 USCMA 681, 690, 21 CMR 3, in which we said:

". . . Yet it has been settled that voluntary manslaughter and self-defense are not inconsistent. That result is reached on the theory that fear may either produce passion or a reasonable belief that death is imminent. Stevenson v United States, 162 US 313, 16 S Ct 839, 40 L ed 980 (1896). Thus, we are unwilling to say that the law officer's use of the term 'heat of passion caused by adequate provocation' was sufficient to bring home to the triers of fact the legal principle that fear, as well as anger, may reach that uncontrollable state which will reduce murder to manslaughter. Nor can it be said that the requested charge did not point up that theory. Although we have never passed precisely on the question, this Court has observed that in determining whether an unlawful killing was committed in the heat of passion caused by adequate

provocation, fear may be sufficient to excite uncontrollable passion. United States v Adams, 5 USCMA 563, 18 CMR 187. And this statement of the law is in direct accord with the Federal rule that heat of passion may be produced by fear as well as by rage."

Appellate Government counsel find no fault with a suggestion that fear may constitute the quantum of passion sufficient to blind the senses of an accused, thereby reducing the degree of homicide to voluntary manslaughter. It is submitted, however, that such fear must be of a proportion equal to unreasoning terror or violent passion, and must be concurrent with and aroused by the provocative acts of the victim; and that the evidence of fear and provocation in this case fails to describe a condition of sufficient terror or provocation.

First, we observe the ultimate determination of the existence, and degree of such fear is for the triers of fact. Our duty, and that of the board of review, is to determine whether the evidence was sufficient to reasonably raise the issue of voluntary manslaughter.

Appellate Government counsel concede a reluctance to point to a particular case and argue similarity, since there usually exist dissimilarities between any two cases. They cite United States v Maxie, 9 USCMA 156, 25 CMR 418, and carefully point out what they deem to be considerable instances in which the facts of that case and the case at bar are identical or markedly similar. There we held the evidence to be insufficient to require an instruction that fear may produce heat of passion.

In *Maxie*, supra, page 161, we said:

". . . At the moment he shot, accused was across the room from the deceased, who was unarmed, and too far away to so much as touch him. The accused had a police club to use in his defense rather than the revolver and he could have sought the aid of at least four servicemen in the barracks who were in no way hostile to him. . . . Certainly, when time and circumstances permit

an accused to reflect on the killing of a victim, that mental state of fear which will reduce murder to manslaughter is not present. Here the accused knew prior to the killing that he intended to put an end to the victim's taunts. He cogitated sufficiently well that he penned a note to his commanding officer informing the latter to notify his wife when the tragedy had ended. He took the time to deliver the latter in person, arm himself with both a lethal weapon and a police club and then shot the victim when he appeared at the door. He had expressed an intent to kill, he failed to seek help from other service personnel who he knew were present in the barracks, and at no time prior to the killing did he exhibit any fear of the victim. . . . His theories of self-defense and heat of passion were submitted to the court-martial, and they were resolved contrary to his contention. Any other theories are not raised by the evidence. Accordingly, the law officer did not err in his instructions to the court-martial."

*Maxie* and the case at bar must be distinguished. In *Maxie* the law officer did instruct on voluntary manslaughter but did not instruct that fear as well as rage may produce heat of passion. In addition, in *Maxie* the deceased was unarmed and accused only claimed he thought he had a knife in his pocket, which he did not. In this case the deceased had an M-14 rifle and ammunition in his hands, and accused stated he had heard the sound of the weapon's action and the statement, " 'I'll kill him. I'll kill him,' " as deceased turned toward accused. Accused and deceased were some ten feet apart, so there was no opportunity to seize deceased's rifle or disable him by lesser action. Accused had observed deceased seize the rifle of another sentry, load it, and harass three sentries with the loaded rifle until dissuaded by others present. Now no other person was present. The accused and deceased were alone. There was no time in which the accused could reflect on the killing of the deceased.

This was a fast moving situation, as the accused testified:

". . . At the same time I saw this, I saw the muzzle of his rifle and I then—it was all in one motion. Its [sic] hard to explain exactly what took place, but as I brought my rifle up, I hit the operating rod handle, pushed the safety forward, and pulled the trigger. . . ."

Deceased had but recently committed several irrational acts of violence, all of which were known to the accused. The accused also knew of other instances of violence on the part of deceased. In light of those facts and deceased's acts on the night in question, we cannot say that this transcript fails to raise an issue of unreasoned passion due to uncontrollable fear reasonably incited by adequate provocation.

On the entire record we are not prepared to hold that the board of review erred in holding that the lesser offense of voluntary manslaughter was reasonably raised by the evidence, or in its conclusion that the members of the court, under proper instructions by the law officer, might not have concluded that the homicide was no more than voluntary manslaughter. The certified question, accordingly, will be answered in the affirmative.

## II

The first issue granted by this Court inquires whether the accused was prejudiced by the board of review reducing the findings from unpremeditated murder to voluntary manslaughter, when such lesser offense had not been submitted to the court-martial.

Recently, and at the present term of this Court, the identical question was considered in United States v Patterson, 14 USCMA 441, 34 CMR 221. We there held such action of the board of review to be within its power. For the reasons stated in that case, we overrule the present assignment of error.

## III

In his instructions to the court-martial on the charge of murder, the law

officer required it to find from the evidence beyond a reasonable doubt all of the elements of that offense in order to convict. He then proceeded to inform the court that intent may be proved by circumstantial evidence; that is, by facts and circumstances from which, according to the common experience of mankind, the court-martial may reasonably infer the existence of an intent. Thus, the court-martial would be justified in inferring that a person must have intended the natural and probable consequences of an act purposely done by him, and if a person does an intentional act likely to result in death or great bodily harm, it may be inferred that he intended death or great bodily harm. He then advised that the weight, if any, to be given an inference of the accused's intent must, of course, depend upon circumstances attending the proved facts which give rise to the inference, as well as all the other evidence in the case; and that it was for the court-martial to make this determination. At this point the law officer included the following language:

"The court is further advised that the killing of a human being is unlawful when done without justification or excuse. In the absence of any evidence that the killing was justified or excusable, the court is entitled in inferring that such killing was unlawful."

The law officer then defined justifiable homicide and instructed that there was no evidence of justifiable homicide in this case. He advised that a homicide which is the result of an accident or misadventure in doing a lawful act in a lawful manner, or which is done in self-defense, is excusable; and that there was no evidence of accidental killing in this case. He admonished that the question of self-defense had been put in issue by the evidence with respect to the offense of murder, and instructed that an accused is excused for killing in self-defense if he believed on reasonable grounds the killing was necessary to save his own life or to prevent great bodily harm to himself.

The law officer then proceeded at considerable length to tailor the facts of the case to the legal principles expounded in an admirable manner, and correctly, as we shall see in our later discussion of the final assignment of error. In the instructions which he gave, the law officer furnished the court with the law pertinent to the facts developed in order that they might resolve the issues before them. We commend the law officer for having followed the spirit and intent which we expressed in United States v Smith, 13 USCMA 471, 33 CMR 3.

The language of the instruction herein last quoted gives rise to the next issue before us. That is, was it correct to so instruct?

The first sentence from the above quotation, "The court is further advised that the killing of a ▆▆▆▆ ▆ human being is unlawful when done without justification or excuse," is a correct definition of homicide. Perkins, Criminal Law, page 26 (1957); 40 CJS, Homicide, § 1, page 823. The second sentence, "In the absence of any evidence that the killing was justified or excusable, the court is entitled in inferring that such killing was unlawful," is a correct statement of the permissible inference available to the triers of fact. It is to be noted that the instruction extended no further than an inference of "unlawful." Thus, the two sentences relate to an inference that an "unlawful homicide" had been committed.

We believe the language used to be a correct statement of the law on this subject. A meaningful exposition of the question requires consideration of elementary propositions of law. We quote from Miller, Handbook of Criminal Law, §§ 82, 86, and 88(f), pages 251, 262, and 271 (1934), respectively:

"One of the greatest obligations of organized governments is the preservation of human life. Consequently, generally speaking, life-taking or killing by individuals is prohibited. However, in some instances, the law recognizes that killing is necessary. The word 'homicide' is used to describe all taking of human life by human act or agency. To distinguish between necessary and un-

necessary taking of human life, the law classifies homicide as justifiable, excusable or felonious. . . . A more useful classification under present day conditions is secured by merely distinguishing between lawful and unlawful homicide."

"Felonious homicide is the killing of one human being by another without justification or excuse. Whether death results from a direct act upon the part of the defendant or from his omission to discharge a legal duty, he is guilty of felonious homicide; unless it can be shown in his behalf that some circumstance of justification or excuse was present, or that some disability or exemption existed. Felonious homicide may be either murder or manslaughter."

". . . If, from the facts and circumstances accompanying the homicide as given in evidence by the prosecution or by the defense, no circumstances of excuse, justification, or provocation appear, the burden of proof is sustained by proof of the homicide. But, if the facts and circumstances give rise to a reasonable doubt, the doubt should avail in favor of the accused. If, upon the whole evidence, the jury have a reasonable doubt whether the accused is guilty of the higher offense, they should acquit him thereof."

The language of the law officer's instruction, it will be noted, did not extend the inference to the offense of murder, but only to homicide. Manifestly, no fault may be found with that advice. Even malice may be inferred in a proper case. In Commonwealth v Bedrosian, 247 Mass 573, 142 NE 778, 779 (1924), the following appears:

" . . . In other words, if there was an intention to inflict injury upon the deceased which was not justified on any lawful ground or palliated by the existence of any mitigating circumstances, that intention was malicious within the meaning of the law."

See 40 CJS, Homicide, § 1, page 823; Clark and Marshall, A Treatise on the Law of Crimes, 6th ed, § 10.00, Homicide, at page 532.

We conclude there was no error in the inclusion of the portion of the instruction here under consideration.

IV

The remaining assignment calls into question the propriety of that portion of the law officer's instructions on self-defense advising as follows:

"In determining whether the actions of the accused were reasonable in this case, you should consider all the facts and circumstances in the case, except his condition or degree of intoxication, as I will explain later. • • •
 • • • • •

"The court is advised that voluntary drunkenness is no defense to the charge of unpremeditated murder. Likewise in self-defense the effect of prior voluntary drunkenness should not be used in determining whether the accused was, in fact, in reasonable fear of immediate death or serious bodily injury. A person who is drunk or under some influence of intoxicating beverages may react differently when confronted with a dangerous situation than he would if he was sober. This would not entitle him to use any greater force than he would have been entitled to use if he was sober. Thus, you should measure whether the accused was in fact and on reasonable grounds in fear of imminent death or serious bodily injury without regard to his condition or degree of intoxication."

Again, initially, we resort to a statement of elementary propositions of law. Thus, from Clark and Marshall, A Treatise on the Law of Crimes, 6th ed, § 7.03, page 432, we quote the following statement with regard to the reasonableness of action in self-defense:

". . . the law makes no discrimination in favor of a drunkard . . . or any particular individual."

See the treatment of drunkenness and intoxication in Miller, Handbook of Criminal Law, § 42(c), at page 140. See also Perkins, Criminal Law, page 792.

40 CJS, Homicide, § 126b(b), is to the same effect. Citing Bleich v People, 227 Ill 80, 81 NE 36 (1907), it states, at page 1006:

". . . A belief in the necessity of killing does not excuse accused where it arises only from his intoxicated condition."

Likewise, in 26 Am Jur, Homicide, § 139, page 252, we find:

". . . If, for example, voluntary intoxication induces a misapprehension of the hostile intentions of another or causes one to take an unjustified or exaggerated belief of the necessity of taking the life of another in self-defense, the slaying of such other person cannot be justified or excused on the theory of self-defense."

See also "Homicide in Self-Defense" by Professor Joseph H. Beale, Jr., 3 Columbia Law Review 526–528; Director of Public Prosecutions v Beard, [1920] AC 479, and Annotation: "Voluntary intoxication as defense to homicide," 12 ALR 861, 894; and a later Annotation to State v Stenback, 78 Utah 350, 2 P2d 1050 (1931), at 79 ALR 878, 906.

Finally, we quote at some length from the very frequently cited case of Springfield v State, 96 Ala 81, 11 So 250 (1892). In that case, the court instructed the jury as follows:

" '. . . If the defendant did not exercise prudence by reason of indulgence in strong drink, or for other cause, and therefore formed an unjustifiable belief that it was necessary for him to shoot in his defense, he cannot avail himself of such a belief.' "

In disposing of an assignment directed to that portion of the instructions, the Supreme Court of Alabama used the following language:

". . . There was evidence tending to show that appellant had been drinking shortly before the killing occurred, and was under the influence of liquor at the time, but not sufficiently so as to incapacitate him for knowing what he was doing. In a preceding portion of the general charge the court had correctly instructed the jury as to the law of self-defense, and that portion of the charge to which this exception is addressed instructed the jury, in effect, that if the defendant by voluntarily putting himself under the influence of liquor incapacitated himself for taking such a view of the situation as a reasonably prudent man would have taken under the circumstances, and, in consequence thereof, he acted upon an exaggerated or unjustifiable belief as to the necessity for taking the life of the deceased in defense of his own, such belief could not avail him as a defense to the charge in the indictment. This is unquestionably the enunciation of a sound principle of law. Justification for taking human life is not to be found in the excited or tortured imaginings of men whose passions are inflamed by what is generally recognized as itself often a potent incentive to crime. If such excuses could avail in the courts, human life would be cheapened, crime encouraged, and the safeguards provided by law for security to life and property would be seriously impaired. Drunkenness on the part of the accused at the time of committing the homicide may have the effect of reducing the offense from murder to manslaughter, if shown to have been so excessive as to render him incapable of forming the design to take life; but there is no principle of law which authorizes drunkenness to be invoked as an excuse for crime, or as a ground for enlarging the right of self-defense. King v State, 90 Ala 612, 8 South Rep 856; Cleveland v State, 86 Ala 1, 5 South Rep 426; Williams v State, 81 Ala 1, 1 South Rep 179; Fonville v State, 91 Ala 39, 8 South Rep 688." [Springfield v State, supra, at page 252.]

We believe that the law officer, in the portion of the instructions involved, gave the court-martial a correct statement of the law on this ■■■■■ question. In addition, he restricted the general principles of law to the facts of the case before him, and thus tailored his instructions in a commendable manner. We, therefore, overrule the assignment.

The record herein reflects that the accused received a fair trial and that the action of the board of review in affirming the lesser included offense of voluntary manslaughter and reassessing the sentence, gave the accused the benefit of every relief to which he was entitled.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.