UNITED STATES, Appellee

v

LARRY CLARK, Private, U. S. Army, Appellant

No. 27,046

December 28, 1973

*Captain John T. Willis* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Lieutenant Colonel Edward S. Adamkewicz, Jr., Captain Peter M. Davenport, Captain Gary E. Garbis,* and *Captain William X. Parsons.*

*Lieutenant Colonel Donald W. Hansen* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Merle F. Wilberding, Captain John P. Pinkerton,* and *Captain Robert C. Roth, Jr.*

OPINION OF THE COURT

DUNCAN, Judge:

Charged with premeditated murder, the appellant was convicted of the lesser included offense of unpremeditated murder, and sentenced to dishonorable discharge, total forfeitures, confinement at hard labor for 20 years, and reduction in

grade. Intermediate reviewing authorities have approved and affirmed the findings and sentence. We granted review on the following question:

Whether the military judge erred to the substantial prejudice of the appellant by refusing to instruct the court on the offense of voluntary manslaughter.

Since the early case of United States v Clark, 1 USCMA 201, 2 CMR 107 (1952), this Court has consistently followed the rule that the military judge is required to instruct, *sua sponte,* on any and all lesser included offenses for which there is in the record some evidence reasonably placing these offenses in issue. See United States v Moore, 16 USCMA 375, 376, 36 CMR 531, 532 (1966); United States v Kuefler, 14 USCMA 136, 138, 33 CMR 348, 350 (1963).[1] "[A]ny doubt as to the sufficiency of the evidence to require instruction should be resolved in the accused's favor." United States v Bairos, 18 USCMA 15, 17, 39 CMR 15, 17 (1968), and cases cited therein.

Voluntary manslaughter is a homicide "committed -in the heat of sudden passion caused by adequate provocation. Heat of passion may be produced by fear as well as rage." Paragraph 198*a,* Manual for Courts-Martial, United States, 1969 (Rev). See also United States v Bellamy, 15 USCMA 617, 620, 36 CMR 115, 118 (1966); United States v Desroe, 6 USCMA 681, 21 CMR 3 (1956). "[T]he ultimate determination of the existence, and degree of such fear is for the triers of fact." United States v Judkins, 14 USCMA 452, 456, 34 CMR 232, 236 (1964). In United States v Bellamy, supra, we quoted the following from Stevenson v United States, 162 US 313, 314–15 (1896):

" '. . . The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder. . . . The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder and not manslaughter, or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.' "

15 USCMA at 621, 36 CMR at 119.

The shooting took place in the office of the mess hall. The deceased, Sergeant Harris, was the noncommissioned officer in charge of the mess. The appellant was a cook in the same mess.

On August 10, 1971, about 8:30 a.m., Harris escorted the appellant and another soldier to Captain Pedigo, the commanding officer, to report they had been absent without authority that morning. Harris advised Captain Pedigo that the appellant's absence was his third or fourth and that Harris had reached the end of his patience. Pedigo testified that words passed between Harris and the appellant. After Pedigo advised the appellant that he would impose Article 15 punishment on him, the appellant left the office to return to work at the mess hall. Harris remained to discuss the case of the other absentee. About 20 minutes later, Harris left and returned to the mess hall. On arrival he called the appellant into the office and closed the door. Sergeant McGuine and a German salesman were in the office discussing a supply agreement. Harris and the appellant went to the back of the office where Harris started talking in a loud tone. McGuine heard the appellant say, "You don't have to touch me, take your hand off me." A second or two later "a loud noise or scuffling" caused McGuine to look to the back of the room. The appellant's back was against a filing cabinet

---

[1] For additional citations, see Tedrow, Digest, Annotated and Digested Opinions, US Court of Military Appeals at 518–21.

and Harris was pressed up against him.[2] McGuine went over and told them to come apart. As they separated, McGuine saw a baseball bat in Harris' hand. McGuine threw up his hands and said, "Hold it." Harris then said, "No, no, I'm just showing you that Clark drew this ball bat on me."[3] While McGuine was admonishing Harris against doing something which might jeopardize his career, the appellant moved behind McGuine and left the office. Harris then called Sergeant Gibby into the office. Specialist Showers came with him. The homicide occurred about 15 minutes later.

There were four witnesses to the shooting, all of whom were in the mess hall office at the time—Sergeant Mc-Guine, Sergeant Gibby, Specialist Showers, and Gerhard Kissig, a German national. According to their testimony, the appellant appeared in the doorway and addressed Harris: *McGuine:* "Why did you hit me?" *Showers:* "Sergeant Harris, what are you trying to do to me?" Gibby and Kissig heard the appellant speak, but did not know what he said. McGuine testified that Harris replied, "Because you told a goddamn lie up in the CO's office." It was Gibby's testimony that Harris said, "You told a lot of damn lies on me when we were in the CO's office." Neither Showers nor Kissig recalled Harris' reply. All agreed, however, that at the time the appellant fired his pistol, Harris had a baseball bat in his hand.[4] He had been "pounding" or "beating" it on the floor while speaking with Gibby and Showers. The German national did not recall much of what happened, but each of the servicemen testified that as Harris replied to the appellant's query he brandished the baseball bat at the appellant and took at least one step toward him. Harris had his arm and the bat raised above shoulder level and was shaking it as one might shake a finger. McGuine and Showers believed that Harris was within striking distance of the appellant, while Gibby believed that

another step forward would have been required. Showers thought Harris was "angry . . . he was hollering and beating the bat on the floor." McGuine testified that "[h]e [Harris] appeared to be upset about something." On cross-examination, Showers was asked:

Q: At any time when you were in that room, Specialist Showers, did you feel that there was any reason for anybody to fear grievous bodily injury?
A: Sir, if I had been Clark, I would have.

Q: You would have if you were in his shoes?
A: Standing there across from Sergeant Harris with a bat, I would have.

Q: From your observations of that man that you watched move toward Clark with a bat to within striking distance, did you feel that he was going to strike Clark?
A: Sir, I think if Clark would have talked to him he would have.

McGuine was aware of one instance when Harris had called an enlisted man into the office, closed the door, and struck him. Showers had heard of two such instances but had not seen them happen. Harris had a reputation for being vocally abusive of his men, both in private and in the mess hall, when the meal was being served. The appellant was known as a quiet, peaceful man.

The appellant testified that he was "upset" at Sergeant Harris for taking him to Captain Pedigo, but he insisted that he bore no "grudge." When called into the office by Harris, he went to the "back" of the room with his head bowed because he "figured" that Harris was "just going to chew . . . [him] out." Instead, Harris charged that he had called him "a goddamn liar" before Captain Pedigo and that he was going "to war." Thereupon, he "looked up" and Harris hit him with his fist. The blow caused him to stumble against a file cabinet. Harris then "threw a body block at me

---

[2] The appellant was 5 feet 7 inches tall and weighed 135 pounds. Harris was stocky, approximately 6 feet in height and weighed over 200 pounds.

[3] On cross-examination, McGuine ac-

knowledged that he believed Harris was lying when he made this statement.

[4] The baseball bat, which appears in Prosecution Exhibits 4–6 (photographs), was estimated by Sergeant McGuine to measure about 3 feet.

or something" and all he could remember of what happened next was that Harris "had this bat" and was "raising" it when Sergeant McGuine stepped between them. He "headed out" of the office. He was "scared," his mouth was bleeding, and he thought that Harris "was trying to kill . . . [him] or something." He went to his room. The appellant does not recall speaking with his roommate, Brooks, but the latter testified that when the appellant entered the room he had a scared look on his face. When asked what was wrong, the appellant stated that Harris had hit him and "busted" his lip. He also told Brooks that "if it wasn't for Sergeant McGuine, Harris would have beat him to death or killed him. . . . He said he would have done it with a baseball bat."

When the appellant entered his room, he remembered the gun in his wall locker.[5] He took the gun out of the locker and returned to the mess hall. "I figured that maybe I could scare him or something with the gun if he tried that again." Appellant returned to the mess hall because he believed that if he did not "it was just going to be another AWOL." He returned to his job of patting butter at a table "right next to the office," the door of which was ajar. He overheard Harris "telling somebody in the office that I had this bat that I was going to hit him with." Appellant testified:

So when I heard him I went to the door to let the people know that was in the office there that I didn't try to hit him with the bat, that he was the one who had the bat and that say, like he was trying to hit me then with the bat. And so I went into the office and I asked Sergeant Harris, I believe I asked him something like why did you hit met or something like that I believe it was. I think that was what I said. And when I said that, that's when he started coming at me with the bat and before I knew it I pulled the gun out and shot him.

When the appellant went to the door,

he "was still pretty shook up from being there the first time." When Harris came at him with the bat, he was "scared." He had no intention of shooting Harris. He believed Harris was close enough to hit him with the bat. "It all happened in a few seconds, not even a few seconds, real quick like. . . . I saw a bat up in the air and if he would come down he could have hit me." On cross-examination, the accused testified that he did not mean to shoot Harris. "[I]t just happened so fast. . . . He came running at me with the bat and I was scared and I shot him." Appellant believed that "he [Harris] was trying to hurt me." Although the appellant is left-handed, he put the gun in his right pocket. He did not know why. "I was just scared. I just put it in my pocket. I didn't think about it." Appellant had never fired a handgun before.

Government counsel concede that "[t]here can be no question that testimony was presented from which one can conclude that the appellant was in fear." They contend, however, that the military judge did not err in refusing to instruct on voluntary manslaughter on the ground that "the evidence does not show that Sergeant Harris' actions were sufficient to provoke a reasonable man into uncontrollable action."

■ While the main thrust of the defense position at trial was that the death of Harris occurred as a result of self-defense on appellant's part, such a position is not inconsistent with the theory that the homicide was as a result of voluntary manslaughter. In United States v Desroe, supra, we said:

[I]t has been settled that voluntary manslaughter and self-defense are not inconsistent. That result is reached on the theory that fear may either produce passion or a reasonable belief that death is imminent. Stevenson v United States, 162 US 313, 16 S Ct 839, 40 L Ed 980 (1896). . . . [I]n determining whether an unlawful killing was committed in the heat of passion caused by adequate provocation, fear may be sufficient to excite uncontrolla-

<hr>

[5] The gun belonged to a friend who had left it with the appellant to avoid it being discovered during a shakedown. He had the gun about 7 days and had never taken it out before.

ble passion. United States v Adams, 5 USCMA 563, 18 CMR 187 [1955].

6 USCMA at 690–91, 21 CMR at 12–13.

In United States v Bellamy, supra, we said:

When a claim of voluntary manslaughter is made, the existence and sufficiency of passion are "essentially" questions of fact to be submitted to the jury under proper instructions whenever it can be said that the alleged provocation would have *any reasonable tendency* to produce sudden and uncontrollable anger and heat of blood in the ordinary man. The question of such reasonable tendency is of necessity a question for the court arising upon the admission of testimony. (26 Am Jur, Homicide, § 511, pages 510 and 511; cases cited in footnotes 6 and 7.) (Emphasis added.)

15 USCMA at 620, 36 CMR at 118.

■ Although the military judge's determination that a lesser offense is, or is not, in issue should not be lightly disregarded, an appellate tribunal must independently evaluate the evidence to determine whether or not an accused has been deprived of his right to have the court-martial consider all reasonable alternatives of guilt. United States v Bellamy, supra at 621, 36 CMR at 119, and cases cited therein.

■ In our opinion, the record in this case clearly reflects some evidence of that degree of "fear . . . sufficient to excite uncontrollable passion" to raise the issue of voluntary manslaughter. United States v Desroe, supra at 691, 21 CMR at 13. At this juncture, the determination of the remaining questions is for the members of the court acting under proper instructions. Stevenson v United States, supra; United States v Bellamy, supra.

We hold, therefore, that the military judge erred in denying the defense request for an instruction on voluntary manslaughter.

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Army. The Court of Military Review may affirm the lesser offense of voluntary manslaughter and reassess the sentence, or a rehearing may be ordered.

Chief Judge DARDEN concurs.

QUINN, Judge (dissenting):

Evidence of fear of grave injury does not automatically equate to fear of such depth and intensity as to amount to heat of passion. See United States v Snyder, 6 USCMA 692, 697, 21 CMR 14, 19 (1956). The question is whether there is sufficient evidence of fear in this record from which the court members could, under proper instructions, find that accused killed in heat of passion caused by provocation that "would have any reasonable tendency to produce . . . uncontrollable . . . [fear] in the ordinary man." United States v Bellamy, 15 USCMA 617, 620, 36 CMR 115, 118 (1966).

The accused's own account of his first meeting with Sergeant Harris in the mess hall office leaves no doubt that his fear of injury at the hands of Harris did not generate uncontrollable passion in him. He took the gun from his locker on the basis of a reasoned conclusion that it would provide a suitable means of persuading Harris not to hit him again, if Harris were to attempt to do so. His decision to go to his assigned work area to avoid another charge of unauthorized absence also negates any idea that he was in the throes of an overwhelming emotion. Similarly, the circumstances immediately preceding the accused's return to the office for the second and fatal encounter contain no hint of a "fear . . . reach[ing] that uncontrollable state which will reduce murder to manslaughter." United States v Desroe, 6 USCMA 681, 691, 21 CMR 3, 13 (1956). Certainly, the accused did not act out of fear when he left his work table in the kitchen to stand in the doorway of the office; nor is fear apparent in his decision to challenge Harris' version of the first meeting in the office, which he alleged he overheard. Finally, no hint of fear appears in either the language of the question he put to Sergeant Harris as he stood in the doorway of the office, or in the circumstances under which he presented the question.

We come then to Harris' movement toward the accused. The accused testified that he saw the baseball bat and he

believed that if Harris "would come down he could have hit" him. He was "scared" that Harris was going to hit him so, in that instant, he "pulled the gun out and shot" him. Giving this testimony its most expansive effect, it reflects, in my opinion, a "calculated effort to slow up an anticipated attack," which is an ingredient of self-defense, and does not indicate conduct of one whose "mind [is] befuddled by . . . fear," the characteristic of heat of passion. United States v Maxie, 9 USCMA 156, 161, 25 CMR 418, 423 (1958). Additionally, I perceive nothing in the evidence to provoke fear of such pervasive and uncontrollable proportions as to "render the mind of a person of ordinary temper incapable of cool reflection." Id. at 161, 25 CMR at 423.

The accused admitted he knew that Sergeant Harris would not "do anything" if other people were present. He knew several persons were in the office when he decided to apprise them of his version of the earlier encounter with Harris. He also admitted he knew that a desk stood between himself and Harris. True, he maintained that he believed that Harris was "trying to get" him, but in assessing the adequacy of provocation, the question is not how the circumstances appeared to the accused, but how they appeared to a person of ordinary sensibilities. The situation that confronted the accused was like that we considered in United States v Black, 3 USCMA 57, 11 CMR 57 (1953).

In *Black,* as here, "there were nearby several individuals upon whom the accused could call for assistance; there was present at least one noncommissioned officer charged with the responsibility of maintaining order." There, as here, the accused purported to be frightened by the movement of the victim, but the victim was killed before he "could make his purpose clear." Id. at 60, 11 CMR at 60. Thus, Sergeant McGuine testified that Harris was "always talking with something or pointing or waving his hands or something," and Sergeant Gibby testified that Harris shook the bat as one would "shake your finger." As in *Black,* therefore, the movements which the accused asserted generated fear in him were "insufficient to excite in the mind of a reasonable man an uncontrollable passion." Id. I conclude, therefore, that the trial judge properly denied the defense request for an instruction on voluntary manslaughter. I would affirm the decision of the Court of Military Review.