# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**K.J. BRUBAKER, M.C. HOLIFIELD, A.C. RUGH**
Appellate Military Judges

## UNITED STATES OF AMERICA

v.

## NATHANIEL L. COSBY
## MASTER SERGEANT (E-8), U.S. MARINE CORPS

### NMCCA 201400318
### GENERAL COURT-MARTIAL

**Sentence Adjudged:** 26 April 2014.
**Military Judge:** Col J.K. Carberry, USMC.
**Convening Authority:** Commander, U.S. Marine Corps Forces, Pacific, Camp H.M. Smith, HI.
**Staff Judge Advocate's Recommendation:** LtCol W.N. Pigott, USMC.
**For Appellant:** C. Ed Massey, Civilian Defense Counsel; LT David Warning, JAGC, USN; LT Jessica L. Ford, JAGC, USN.
**For Appellee:** Capt Cory A. Carver, USMC; LCDR Keith B. Lofland, JAGC, USN.

### 31 August 2015

---------------------------------------------------
### OPINION OF THE COURT
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

HOLIFIELD, Judge:

A panel of officer and enlisted members, sitting as a general court-martial, convicted the appellant, contrary to his pleas, of murder while engaging in an inherently dangerous act and obstruction of justice, in violation of Articles 118 and

134, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 934.[1] The members sentenced the appellant to confinement for life and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

The appellant raises four assignments of error (AOE):

(1) The appellant's sentence is inappropriately severe;

(2) The admission of a sentencing exhibit unduly inflamed the passion of the members and was plain error;

(3) The CA's denial of the appellant's individual military counsel (IMC) request was error; and,

(4) The appellant's conviction is legally and factually insufficient.

After careful consideration of the record of trial and the written submissions of the parties, we find the findings and sentence are correct in law and fact, and we find no error materially prejudicial to the substantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ.

**Background**

The appellant, stationed in Japan, traveled to Hawaii on 15 May 2013 for temporary additional duty with Joint POW/MIA Accounting Command (JPAC). Upon arriving in Hawaii, the appellant purchased a pay-as-you-go cellular telephone and rented a white Chevrolet Traverse. The appellant then reported to JPAC and, after being told to return at 0900 the next morning, was released for the day.

After checking into the Aston Hotel in Waikiki, at approximately 1630 the appellant went into town. His first stop was a restaurant where he ate and consumed alcohol for approximately five to six hours. He next went to a bar, Kelley O'Neil's, where he continued to drink heavily. At approximately 0345, the appellant exited the bar and met IH, the deceased victim, standing directly outside of Kelley O'Neil's. Surveillance video obtained from the bar shows the appellant

---

[1] The appellant was acquitted of unpremeditated murder. After a finding of guilty to attempting to patronize a prostitute, the military judge dismissed that charge for failure to state an offense.

2

having a brief conversation with IH, and then walking with her in the direction of his hotel.

Surveillance footage obtained from the Aston shows the appellant and IH entering the hotel and riding the elevator together. This was the last time IH was seen alive.

IH was visiting Hawaii with a boyfriend, MM, and a girlfriend, JG. Both IH and JG worked as prostitutes, and IH was working as such when she met the appellant. When working, IH would stay in contact with her friends via text message. On the evening of 15-16 May, one of the last text messages IH sent was to MM: "Going to the Aston."[2]

Neither JG nor MM heard from IH again. They became concerned and, after contacting the local hospital and jails to determine if IH had been injured or arrested, filed a missing persons report with the Honolulu Police Department (HPD).

At approximately 0600 on 16 May, video surveillance footage shows the appellant exiting the hotel rolling a large plaid duffel bag and loading it into his rental car. To exit his floor, the appellant used the employee service elevator, which was not equipped with cameras. He was captured, however, by the hotel's cameras on the upper level lobby, the elevator to the lower level lobby, and again in the lower level lobby as he departed. Cell phone records show the appellant made phone calls at 0811 and 0813 via a cell phone tower located on the west side of Oahu, approximately an hour's drive from Waikiki. The appellant was next seen at approximately 0900 reentering the hotel without the plaid duffel bag. He exited the hotel eighteen minutes later wearing his uniform, and reported to JPAC at approximately 0945.

When the appellant arrived at work, members of his command observed a fresh cut on the right side of the appellant's forehead. His explanation for his late arrival and injury was that he "woke up late, looked at the clock, jumped out of bed, ran around the corner, slipped on the rug, and hit his face on the corner of the dresser in his hotel room."[3] The appellant remained at work for a few hours and was released.

That evening, just after midnight, the appellant purchased nearly 19 gallons of gas for his rental vehicle. He then

---

[2] Record at 175.

[3] *Id*. at 280.

returned to the Aston hotel, where he is seen on video carrying the plaid duffel bag. The next morning he checked out of the Aston and checked into the Navy Lodge. The appellant spent most of his remaining time on the island in his room, although he did seek medical attention at a military clinic for lacerations on both his forehead and left forearm. He told medical personnel that he suffered the injuries at the beach when waves tossed him into some coral. Before departing on 20 May for a scheduled JPAC mission to China, the appellant left several of his possessions, including the plaid duffel bag, at the home of Sergeant First Class (SFC) MS, a member of JPAC.

At 1735 on the day the appellant departed Hawaii, a young boy discovered IH's naked body in a remote area on the west side of the island. The location was approximately four miles from the tower the appellant's cell phone utilized the morning of 16 May. The boy's family contacted the authorities and the HPD began its investigation. HPD was able to make a preliminary identification based on the missing person report JG and MM filed. An autopsy revealed the manner of IH's death was homicide by "injury to the neck."[4] A forensic entomologist opined that IH's body was not exposed to the elements until approximately midnight on the day she disappeared.

The investigation led HPD to the appellant's Aston hotel room. A forensic search revealed only a small blood stain on a curtain. HPD later located and searched the Chevrolet Traverse the appellant had rented. A dog trained to detect human remains "alerted" towards the rear of the vehicle. The investigation also revealed the video surveillance and credit card receipts that led HPD directly to the appellant. When the appellant returned from China on 5 June, he was met at the airport arrival gate by HPD detectives.

In response to HPD's questioning, the appellant admitted that he had met IH on 15 May at Kelley O'Neil's. The appellant stated he knew IH was a prostitute and that he took her to his hotel room. He claimed, however, that when he woke the next morning, IH had already departed. He denied that the injuries he sustained were from a struggle with IH, repeating his claim that he received the cuts while body surfing at a local beach. He denied any knowledge of IH's murder. The appellant was then released into military custody.

---

[4] *Id*. at 321.

4

HPD detectives later retrieved the plaid duffel bag from SFC MS and obtained a search warrant to test the bag. Forensic testing indicated that IH could be a possible contributor to the DNA profile found in the duffel bag. The appellant was arrested on 20 June.

At trial, the appellant testified to a significantly more comprehensive version of events. The appellant stated that he drank alcohol for ten straight hours from the night of 15 May into the early morning hours of 16 May. Due to this alcohol use, he had only fragmented memories of departing Kelley O'Neil's. He recalled meeting IH and walking with her to his hotel, and admitted it may have been possible he knew at that point she was a prostitute. He testified that upon entering his room he sat on the bed while IH went into the bathroom. The appellant claimed he fell asleep while waiting for IH and was awoken by her "shaking [him]" and telling him he needed "to get up and . . . pay her."[5] The appellant claimed he was disoriented, which led to IH becoming angry and frustrated. As she repeatedly asked him for payment, he "told her to leave [the] room, to get out."[6] The appellant testified that the discussion became heated, and that he stood up and began "ushering her towards the door."[7] As IH was standing between the appellant and the door, the appellant moved towards her "gesturing with [his] right hand, and . . . [his] left hand up."[8] The appellant testified that IH then cut him on his left forearm with a "lipstick knife."[9] The appellant claimed he then "decided to get the knife."[10] When asked in cross-examination whether IH attacked him, the appellant responded: "I don't know. All I remember, sir, is getting cut. . . . I don't know if I'd qualify it as an attack. I just know she cut me."[11]

---

[5] *Id*. at 378.

[6] *Id*. at 379.

[7] *Id*. at 380.

[8] *Id*. at 381.

[9] JG testified that she knew that IH carried a "lipstick knife" for protection. JG described the knife blade as approximately one and half inches long concealed within a container designed to look like a lipstick tube. *Id*. at 203.

[10] *Id*. at 381.

[11] *Id*. at 402–03.

5

A struggle ensued and the appellant claimed IH stabbed his face while he "was behind her, and [he] had [his] left hand -- or [his] left arm around her neck."[12]  The appellant was unable to give a blow-by-blow description of the struggle, describing the scene as "chaos."[13]  He did, however, recall his left arm was around IH's neck, squeezing her as he was on the ground with IH on top of him.  He testified he was "trying to submit her."[14]  At some point IH "stopped moving, stopped fighting"[15] and the appellant testified he secured the knife and crawled into the bathroom.  As he sat in the bathroom wiping blood from his eyes and putting pressure on his wounds, the appellant tried to communicate with IH and noticed she was not responding.  He then shook her, eventually rolling her over and realizing she was dead.  The appellant testified that he had no intent to kill her; he "just wanted her out of [his] room."[16]

The appellant then described how he panicked and did not seek help or attempt to revive IH.  He decided he "had to get her out of [his] room and far away from" him.[17]  The appellant removed all of IH's clothes and belongings and placed them in a bag.  He placed IH's naked body in his plaid duffel bag and exited the hotel.  After placing the duffel bag in his rental car, he began driving.

The appellant testified he did not have a plan formed at that point, and simply drove until the road ended.  He turned around, pulled off the road, and "put her down in the tall grass."[18]  The appellant stated he then disabled IH's cell phone by removing the battery and discarded all of her belongings in a dumpster.  After reporting to JPAC later that morning, he returned to his hotel room at the Aston with cleaning supplies.  He testified that he cleaned the room, using bleach and stain remover in an effort to rid the hotel room of any evidence.  The

---

[12]  *Id*. at 383.

[13]  *Id*. at 384.

[14]  *Id*. The appellant was five foot nine inches tall and weighed approximately 185 pounds.  IH was approximately five foot three inches and weighed between 125 and 130 pounds.

[15]  *Id*. at 385.

[16]  *Id*. at 387.

[17]  *Id*. at 388.

[18]  *Id*. at 390.

appellant then checked out of his room at the Aston and moved into the Navy Lodge.

Additional facts necessary to discuss the AOE's are provided below.

## Sentence Appropriateness

We review the appropriateness of a sentence *de novo*. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). Under Article 66(c), UCMJ, this court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Determining sentence appropriateness "involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires an "'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)). While this court has a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *Healy*, 26 M.J. at 395-96.

The appellant argues that a sentence including confinement for life is inappropriately severe, given: the appellant did not intend to kill IH; the death resulted from a dangerous altercation where the appellant was extremely intoxicated and injured; the appellant has more than 16 years of honorable service, including multiple combat tours; the appellant suffers from post-traumatic stress disorder; the appellant has a wife and four children; and, the appellant's use of a "submission hold" was only in self-defense.[19] We disagree.

The Government's experts at trial testified that to cause IH's death the appellant would have had to cut off her ability to breathe for at least four minutes – a period extending far beyond the point at which she would have passed out and ceased struggling.[20] Alternatively, the appellant would have had to use enough force to crush IH's windpipe – something clearly

---

[19] The appellant's claim of self-defense was considered and properly rejected by the members.

[20] *Id*. at 323.

inconsistent with the appellant's claim that he merely sought "to submit her."[21]

As evidenced by their verdict, the members credited the appellant's claim that he did not intend to kill IH. Yet they found that his actions met the definition of murder under Article 118(3), UCMJ. "Article 118 . . . defines but one crime," with its four subdivisions setting forth either aggravating circumstances or "states of mind characterizing murder in a lesser degree." *United States v. McDonald*, 15 C.M.R. 130, 134 (C.M.A. 1954) (citation omitted). The appellant argues that the absence of intent to kill IH makes his sentence inappropriately severe. His actions, however, show a state of mind that properly labels the killing as murder. IH's death was not the result of accident or even culpable negligence; it was the result of the appellant's wrongful actions accompanied by a "murderous" state of mind. "The presence of malice is the element in murder which differentiates that crime from manslaughter." *United States v. Maxie*, 25 C.M.R. 418, 421 (C.M.A. 1958). Here, that "malice," evidenced in the appellant's indifference to the likelihood of death or serious bodily harm, supports a sentence of confinement for life and a dishonorable discharge.

The fact the appellant is a father and husband with an impressive record of military service only makes the circumstances of this case more tragic. It does little to counterbalance the appellant's wanton disregard for IH's life as he choked her to death. Having given individualized consideration to this particular appellant, including his record of service, the nature and seriousness of the offense, and all other matters contained in the record of trial, we are satisfied that justice is done and that the appellant received the punishment he deserved. Granting sentence relief at this point would be to engage in clemency, a prerogative reserved for the CA, and we decline to do so. *Healy*, 26 M.J. at 395-96.

### Sentencing Evidence

The appellant next argues that admission of Prosecution Exhibit 58, a twelve-minute video montage containing 98 photos of the victim accompanied by sentimental music, was plain error. The appellant correctly notes that the trial defense counsel objected to the Government publishing the video during the presentation of its sentencing case, but did not object to the

---

[21] *Id*. at 384.

members viewing the video during their deliberations.  Yet, as the following colloquy demonstrates, the trial defense counsel did more than simply not object:

    MJ:   Any objection to Prosecution Exhibit 58?

    DC[]: Defense has a question.  When will this be published to the members during the course of the government's case during sentencing?

    MJ:   When will it be published?  Here in the courtroom?

    ATC:  It will be provided to members for their review during their deliberations.

    MJ:   Okay.

    ATC:  Sir, if the court's amenable to playing it during – published during the government's case, the government would liked [sic] to do that.

    DC[]: The defense objects, sir.  We're comfortable with the members viewing during their deliberations, sir.

    MJ:   Okay . . . . So let me get this straight, you have no objection to this?

    DC[]: To be used in deliberations.  Yes sir.[22]


    "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  After a thorough discussion with the military judge, the defense did not merely forfeit the issue by failing to object.  Here, the defense specifically waived the issue by expressly agreeing to the video's use during deliberations.

    While this court will review forfeited issues for plain error, "'we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal.'" *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (quoting

---

[22]  *Id*. at 457.

*United States v. Papas*, 409 F.3d 828, 830 (7th Cir. 2005)). Furthermore, the appellant has not alleged, and we find no evidence of, ineffective assistance of counsel regarding the admission of the video. Accordingly, we find no error to review.

## Individual Military Counsel

The appellant's third AOE involves the denial of his IMC request. We have fully considered this issue and find it without merit. *United States v. Clifton,* 35 M.J. 79 (C.M.A. 1992).

## Factual and Legal Sufficiency

In his final AOE, the appellant claims the evidence admitted at trial was both legally and factually insufficient to prove him guilty of violating Article 118(3), UCMJ. To support this claim he argues that the evidence shows he acted in self-defense or, alternatively, with the lower level of culpability associated with manslaughter or negligent homicide, that is, either culpable or simple negligence.[23] We disagree.

*Legal Sufficiency.*

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561-62 (N.M.Crim.Ct.App. 1999), *aff'd*, 54 M.J. 37 (C.A.A.F. 2000); *see also* Art. 66(c), UCMJ.

The elements of Article 118(3) are:

(1) That a certain named or described person is dead;

(2) That the death resulted from the intentional act of the accused;

(3) That this act was inherently dangerous to another and showed a wanton disregard for human life;

---

[23] The first two parts of this AOE (related to self-defense and negligent homicide) are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

(4) That the accused knew that death or great bodily harm was a probable consequence of the act; and,

(5) That the killing was unlawful.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 43b(3).

Here, the appellant's own testimony established that IH's death resulted from the appellant intentionally choking her. The Government's forensic expert testified that, for such choking to cause death, the appellant would have had to have prevented IH from breathing for at least four minutes, or used force sufficient to crush IH's trachea. Either way, the evidence supports a finding that such an act was inherently dangerous, demonstrated a wanton disregard for IH's life, and would probably result in death or great bodily harm. The evidence of the disparity in size and apparent strength, combined with the appellant's testimony that he "[doesn't] know if [he] would qualify [IH cutting him] as an attack,"[24] supports a finding that the appellant did not act in self-defense. Thus, we find the evidence to be legally sufficient.

*Factual Sufficiency.*

Under Article 66(c), UCMJ, we conduct a *de novo* review of factual sufficiency of each case before us. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves convinced of the accused's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N.M.Ct.Crim.App. 2001).

The appellant's testimony clearly established the first two elements of the offense. The essentially unchallenged expert testimony regarding the duration or force required to cause death by choking proves to us that the appellant's act was inherently dangerous to another and showed a wanton disregard

---

[24] Record at 403.

11

for human life.  It also convinces us that the appellant must have known that this act would probably cause great bodily harm or death.[25]  The fact the choking would have had to continue for several minutes after IH became unconscious, combined with the appellant's testimony that he can't say whether he would even label IH's actions as an "attack," disproves any claim of self-defense.  Finally, the appellant's extensive efforts to dispose of IH's body and remove any evidence of her murder clearly demonstrate consciousness of guilt.  Accordingly, we are convinced of the appellant's guilt beyond a reasonable doubt.

### Conclusion

The findings and the sentence, as approved by the CA, are affirmed.

Senior Judge BRUBAKER and Judge Rugh concur.


For the Court



R.H. TROIDL
Clerk of Court

---

[25]  While evidence of voluntary intoxication normally "may be introduced for the purpose of raising reasonable doubt as to the existence of actual knowledge . . . if actual knowledge . . . is an element of the offense," RULE FOR COURTS-MARTIAL 916(l)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), voluntary intoxication cannot reduce unpremeditated murder to manslaughter or any lesser offense.  MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 43(c)(2)(c).  "[V]oluntary drunkenness -- not amounting to legal insanity -- will not in military law negate that general criminal intent, the malice, required for a conviction of unpremeditated murder."  *United States v. Stokes*, 19 C.M.R. 191, 197 (C.M.A. 1955) (citation omitted).